# EXHIBIT 1

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

June 25, 2025

The Honorable Francisco V. Aguilar
Secretary of State
101 North Carson Street, Suite 3
Carson City, NV 89701
sosexec@sos.nv.gov
sosmail@sos.nv.gov

Dear Secretary of State Aguilar:

The Help America Vote Act ("HAVA") establishes minimum standards for states to follow in several key aspects of administration of federal elections, including voting systems, provisional ballots, voter information posters on election days, first-time voters who register to vote by mail, and statewide voter registration databases. HAVA is codified at 52 U.S.C. § 20901 to 21145. In particular, HAVA imposes certain list maintenance obligations on states as part of the uniform statewide database requirements of Section 303(a)(2) of HAVA, 52 U.S.C. § 21083(a)(2), including coordinating the computerized statewide voter registration list ("statewide voter registration list") with state agency records on felony status and death.

Please provide the following information regarding the State's HAVA compliance:

(1)   Describe how the State processes new applications to register to vote for elections for federal office, as required by HAVA Section 303.

(2)   Describe the process by which Nevada assigns a unique identifier to each legally registered voter in Nevada, as required by HAVA Section 303(a)(1)(A).

(3)   Describe how the statewide voter registration list is coordinated with the databases of other state agencies, as required by HAVA Section 303(a)(1)(A). Provide the name of each state database used for coordination, and describe the procedures used for the coordination as well as how often the databases are coordinated with the statewide voter registration list.

(4)   Describe the process by which any duplicate voter registrations are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(B)(iii). Please include an explanation of how the State determines what constitutes a duplicate voter registration record.

(5)   Describe the process by which voters who have been convicted of a felony are identified and, if applicable under state law, removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(I).

(6)   Describe the process by which deceased registrants are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(II).

(7)   Describe all technological security measures taken by the State to prevent unauthorized access to the statewide voter registration list, as required by HAVA Section 303(a)(3).

(8)   Describe the process by which voters who have moved outside the State and subsequently register to vote in another state are identified and removed from the statewide voter registration list, under HAVA Section 303(a)(4)(A).

(9)   Describe the process by which registrants who are ineligible to vote due to non-citizenship are identified and removed from the statewide voter registration list.

(10)  HAVA requires states to verify voter registration information by mandating that applicants provide certain information under HAVA Section 303(a)(5). Please provide a copy of the voter registration application(s) utilized for in-person voter registration, a link to the State's online voter registration application, and, if applicable, the voter registration application used for same-day registration.

(11)  Please describe the verification process under HAVA Section 303(a)(5) that election officials perform to verify the required information supplied by the registrant. Please describe what happens to the registration application if the information cannot be verified.

(12)  Provide a copy of the current agreement, under HAVA Section 303(a)(5)(B)(i), between the chief State election official and the State's motor vehicle authority.

(13)  Provide a copy of the current agreement between the official responsible for the State's motor vehicle authority and the Commissioner of Social Security Administration under HAVA Section 303(a)(5)(B)(ii).

(14)  Under HAVA Section 303(b), describe the State's requirements for an individual to vote if the individual registered to vote by mail and has not previously voted in an election for federal office in the State.

(15)  Please send us Nevada's current statewide voter registration list. Please include both active and inactive voters.

Please provide this information within 30 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

If you have any questions, please email voting.section@usdoj.gov. We very much appreciate your cooperation in our nationwide efforts to monitor HAVA compliance.

Sincerely,

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

cc:    Mark Wlaschin, Deputy Secretary for Elections
       101 North Carson Street, Suite 3
       Carson City, NV 89701
       mwlaschin@sos.nv.gov

# EXHIBIT 2



FRANCISCO V. AGUILAR

101 N Carson Street, Suite 3
Carson City, NV 89701
775.684.5708

July 25, 2025

Ms. Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division
950 Pennsylvania Ave, NW – 4CON
Washington, D.C., 20530
Voting.section@usdoj.gov

**Re:** U.S. Department of Justice Request dated June 25, 2025

Dear Ms. Riordan,

The Nevada Secretary of State's Office writes in response to your June 25, 2025 letter requesting certain information regarding Nevada's compliance with the Help America Vote Act of 2002 (HAVA). Each request is reproduced below, followed by the Nevada Secretary of State Office's response. When the request asked for a document, we appended it as an exhibit to this letter. Additionally, reproductions of relevant provisions of the Nevada Revised Statutes (NRS) and Nevada Administrative Code (NAC) are provided for your convenience as **Exhibit 1**.

1. Describe how the State processes new applications to register to vote for elections for federal office, as required by HAVA Section 303.

Nevada's voter registration procedures, including the procedures for processing new applications to register to vote, are set forth in NRS 293.484-.560, 293.5727-.5847, 293.671, and 293.675, and NAC 293.395-.450.

2. Describe the process by which Nevada assigns a unique identifier to each legally registered voter in Nevada, as required by HAVA Section 303(a)(1)(A).

Per NRS 293.675, the Secretary of State maintains a centralized, top-down database of voter registration information in consultation with each county and city clerk. That information is used to create the official statewide voter registration list (SVRL), which "[i]nclude[s] a unique identifier assigned by the Secretary of State to each legally registered voter in this State." NRS 293.675(3)(e). When a new record is entered into TotalVote (Nevada's statewide elections management system), TotalVote automatically assigns the new registrant a unique "VoterID" number.

**NEVADA STATE CAPITOL**
101 N. Carson Street, Suite 3
Carson City, Nevada 89701-3714

**PAUL LAXALT BUILDING**
**COMMERCIAL RECORDINGS**
401 N. Carson Street
Carson City, Nevada 89701-4201

**LAS VEGAS OFFICE**
2250 Las Vegas Blvd North, Suite 400
North Las Vegas, Nevada 89030-5873

**STATE OF NEVADA CAMPUS**
1 State of Nevada Way, 3rd Floor
Las Vegas, Nevada 89119-4339

nvsos.gov



101 N Carson Street, Suite 3
Carson City, NV
775.684.5708

3. Describe how the statewide voter registration list is coordinated with the databases of other state agencies, as required by HAVA Section 303(a)(1)(A). Provide the name of each state database used for coordination, and describe the procedures used for the coordination as well as how often the databases are coordinated with the statewide voter registration list.

The Secretary of State's Office coordinates the SVRL with databases from four other state agencies:

(a) **The Nevada Department of Corrections (DOC).** On each business day, the DOC uses its database to create a file that is then transmitted to the Secretary of State's Office via secure file transfer protocol. This file lists individuals who have been convicted of a felony and are currently incarcerated (*i.e.*, those whose registrations must be cancelled, *see* NRS 293.540(2)(c)).

Once the Secretary of State's Office has received the DOC file, our office compares the file against the SVRL. If a match is identified, our office includes it in a report for the relevant county. Counties regularly check these reports and review any potential matches that have been identified. *See* NRS 293.540(2)(c); NAC 293.414. When the county verifies the match, it cancels the voter registration within TotalVote.

(b) **The Nevada Office of Vital Records (Vital Records).** On a daily basis, Vital Records uses its database to create a file that is then transmitted to the Secretary of State's Office via secure file transfer protocol. This file lists individuals who have died across the country since the previous day's transmission.

Once the Secretary of State's Office has received the Vital Records file, our office compares the file against the SVRL. If a match is identified, our office includes it in a report for the relevant county. Counties regularly check these reports and review any potential matches that have been identified. *See* NAC 293.464. When the county verifies the match, it cancels the voter registration within TotalVote.

(c) **The Nevada Department of Child and Family Services (DCFS).** On a regular basis, DCFS uses its database to create a file that is then transmitted to the Secretary of State's Office via secure file transfer protocol. This file lists individuals who are part of the Confidential Address Program (CAP) who appear (along with their address) on the SVRL.



101 N Carson Street, Suite 3
Carson City, NV
775.684.5708

Once the Secretary of State's Office has received the DCFS file, our Office compares the file against the SVRL. If a match is identified, our Office manually reviews the file for a potential match. If our Office verifies the match, we delete the improperly disclosed voter registration from the SVRL. Our Office then flags the voter registration for the relevant county, which ensures the CAP individual's identifying information does not appear in any public list.

(d) **The Nevada Department of Motor Vehicles (DMV).** On a daily basis, the Nevada DMV uses its database to identify individuals who have submitted an application for the issuance, renewal, or change of address for a driver's license or identification card for whom it has collected sufficient information that demonstrates the person is qualified to vote pursuant to NRS 293.485, including, without limitation, proof of identity, citizenship, residence and date of birth. *See* NRS 293.5768; *see also* NAC 293.408. The DMV then transmits those records to the Secretary of State's Office via our interactive XML NOVA service on an internal server. The Secretary of State's Office then provides this information to the counties. The procedures for automatic voter registration are set forth in NRS 293.5768-.57699 and NAC 293.408-.409.

Additionally, the connection between the Secretary of State's Office and DMV serves to verify information pursuant to HAVA Section 303(a)(5). For more information, please see the response to Question 11.

4. Describe the process by which any duplicate voter registrations are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(B)(iii). Please include an explanation of how the State determines what constitutes a duplicate voter registration record.

The Secretary of State's Office has three processes for identifying duplicates within the SVRL.

(a) Nevada's TotalVote system automatically checks for duplicates within the SVRL when new registrations are added. TotalVote compares voter registration records across multiple fields in various combinations, including first name (or first three letters of first name), last name, date of birth (DOB), Operator License Number (OLN) (this can be ID Card Number or Driver License Number), and last four digits of SSN (SSN4). If a match is identified, TotalVote flags these potential duplicates for review by the relevant county or counties (in the case of a cross-county match). Counties regularly check these flags and review any potential matches that have



101 N Carson Street, Suite 3
Carson City, NV
775.684.5708

been identified. *See* NAC 293.466. If the county determines that a potential match is a true duplicate, it merges the records. In the case of cross-county matches, both counties work together to determine if the records are duplicates and how to merge, correct, or report on the records.

(b) On a daily basis, the Secretary of State's Office also reviews the SVRL for potential duplicate matches. Duplicate records are determined by the following criteria: (1) identical match on OLN; (2) in instances where criteria #1 does not exist, an identical match on the 9-digit Social Security Number (SSN); (3) in instances where criteria #1 and #2 do not exist, an identical match on registrant's First Name, DOB, and SSN4; (4) in instances where criteria #1, #2, and #3 do not exist and OLN and SSN are not present, an identical match on first name, last name and DOB. The middle name will also be checked if it is included in the record.

If a match is identified based on these criteria, our office includes it in a report for the relevant county (and, in the case of a cross-county match, for both relevant counties). Counties regularly check these reports and review any potential matches that have been identified. *See* NAC 293.466. If the county determines that a potential match is a true duplicate, it merges the records. In the case of cross-county matches, both counties work together to determine if the records are duplicates and how to merge, correct, or report on the records.

(c) To ensure that no matches are missed, every two months, the Electronic Registration Information Center (ERIC) provides the Secretary of State's Office with reports identifying potential in-county and cross-county duplicates. ERIC utilizes a data matching software developed by Senzing and licensed through IBM, which compares common fields like name, address, and other identifiers to determine if the records refer to the same people.

The Secretary of State's Office provides each in-county report to the relevant county and each cross-county report to both relevant counties. Counties regularly check these reports and review any potential matches that have been identified. *See* NAC 293.466. If the county determines that a potential match represents a true duplicate, it merges the records. In the case of cross-county matches, both counties work together to determine if the records are duplicates and how to merge, correct, or report on the records.



101 N Carson Street, Suite 3
Carson City, NV
775.684.5708

5. Describe the process by which voters who have been convicted of a felony are identified and, if applicable under state law, removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(I).

On each business day, the DOC uses its database to create a file that is then transmitted to the Secretary of State's Office via secure file transfer protocol. This file lists individuals who have been convicted of a felony and are currently incarcerated (*i.e.*, those whose registrations must be cancelled, *see* NRS 293.540(2)(c)).

Once the Secretary of State's Office has received the DOC file, our office compares the file against the SVRL. If a match is identified, our office includes it in a report for the relevant county. Counties regularly check these reports and review any potential matches that have been identified. *See* NRS 293.540(2)(c); NAC 293.414. When the county verifies the match, it cancels the voter registration within TotalVote.

Additionally, U.S. Attorney's Offices across the country provide the Secretary of State's Office with reports identifying Nevada residents have been convicted of felonies.

Once the Secretary of State's Office has received the U.S. Attorney's Office file, our office compares the file against the SVRL. If a match is identified, our office includes it in a report for the relevant county. Counties regularly check these reports and review any potential matches that have been identified to see if the individual is currently incarcerated and therefore should be cancelled under NRS 293.540(2)(c). *See* NRS 293.540(2)(c); NAC 293.414. When the county verifies the match and incarceration status, it cancels the voter registration within TotalVote.

6. Describe the process by which deceased registrants are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(II).

On a daily basis, Vital Records uses its database to create a file that is then transmitted to the Secretary of State's Office via secure file transfer protocol. This file lists individuals who have died across the country since the previous day's transmission.

Once the Secretary of State's Office has received the Vital Records file, our office compares the file against the SVRL. If a match is identified, our office includes it in a report for the relevant county. Counties regularly check these reports and review any potential matches that have been identified. *See* NAC 293.464. When the county verifies the match, it cancels the voter registration within TotalVote.

Additionally, every two months, ERIC provides the Secretary of State's Office with a



101 N Carson Street, Suite 3
Carson City, NV
775.684.5708

Deceased Report identifying potential deceased registrants, which it generates by comparing the SVRL with the U.S. Social Security Administration's Death Mater File. On the same cadence, ERIC also provides a Deceased Retraction Report, which reflects persons previously reported on an ERIC Deceased Report who are not in fact dead. The Secretary of State's Office provides these reports to the counties to review any potential matches that have been identified. If the county determines that the individual on the Deceased Report represents is a registered voter in the county, it cancels the voter's registration. If the county determines that an individual on the Deceased Retraction Report is one that has been previously cancelled based on the Deceased Report, it restores the record to active status.

7. Describe all technological security measures taken by the State to prevent unauthorized access to the statewide voter registration list, as required by HAVA Section 303(a)(3).

The State takes technological security measures to protect all of its information and systems, including the SVRL. Some technological security systems protecting the SVRL protect multiple State systems; others are unique to the SVRL.

At the State level, there is a content delivery network that filters and blocks all malicious and unapproved automated traffic. All traffic into the State system must pass through the State-managed firewall that is restricted to only specified ports and protocols needed for public facing interactions. All traffic is also analyzed by the State's intrusion prevention system which monitors and blocks any malicious payloads or command and control communications. A federally monitored intrusion detection system that alerts Department of Homeland Security (DHS) personnel also analyzes traffic for any malicious payloads and command and control communications.

Additionally, the Secretary of State Office perimeter has its own independent firewall that is agency managed. All external traffic that traverses into the Secretary of State Office environment is restricted to specified ports and protocols required for public facing interactions. This firewall logs internally and externally allowing for continuous monitoring. All remote administration access requires multi-factor authentication.

The Secretary of State's Office's server network infrastructure is separated into security zones depending on sensitivity and utilizes micro-segmentation to prevent server to server communication or intrusion. The Office utilizes multiple network monitoring sensor software for logging all communications occurring between systems. All servers utilize a next generation extended defense and response product for individual malware security



101 N Carson Street, Suite 3
Carson City, NV
775.684.5708

as well as utilize Center for Internet Security (CIS) hardened server images. The extended defense and response product includes forensics tracing for all server events and is fed intelligence by automated threat protection feeds from multiple sources. All servers and web applications are subjected to weekly vulnerability scans and follow vulnerability management standards. All servers are backed up twice daily and those backups are offloaded to an offline, port-obfuscated, immutable backup system that independently analyzes the server backup for malicious activity.

In terms of physical security, all Secretary of State Office infrastructure is physically secured in facilities that require identification, and all access is electronically logged to the buildings and the server racks. Access is also recorded on camera. The Secretary of State's Office utilizes port security and certificate verification for all Secretary of State workstations.

As to the SVRL specifically, all access to the SVRL is restricted to specific administrative accounts that are monitored and logged. No login to the system is allowed outside of private network addresses that are individually whitelisted.

8. Describe the process by which voters who have moved outside the State and subsequently register to vote in another state are identified and removed from the statewide voter registration list, under HAVA Section 303(a)(4)(A).

Approximately every sixth months, ERIC provides the Secretary of State's Office with a cross-state report based on matches with other member-provided data and a National Change of Address (NCOA) report based on matches with data from the U.S. Postal Service (USPS). Our office then provides reports to counties to review any potential matches that have been identified. If the county determines that the potential match is an actual match, the counties follow the procedures of NRS 293.530 and 52 U.S.C. § 20507(d) to verify, correct, or cancel the voter's registration.

Counties also rely on information obtained from USPS in connection with their mailings—such as mail returned as undeliverable or notification that a returning address has expired—to trigger the procedures of NRS 293.530 and 52 U.S.C. § 20507(d).

Additionally, the Secretary of State's Office occasionally receives notifications from other states who have been notified by new registrants that they had previously been registered in Nevada. Counties also use this information to trigger the procedures of NRS 293.530



and 52 U.S.C. § 20507(d).

9. Describe the process by which registrants who are ineligible to vote due to noncitizenship are identified and removed from the statewide voter registration list.

Under Nevada law, "any elector or other reliable person" with "personal knowledge" may file an affidavit with the county clerk stating that a registrant is not a citizen of the United States. NRS 293.535(1). The county clerk then notifies the registrant by registered or certified mail, return receipt requested, and provides them with a copy of the affidavit. Unless the registrant, within 15 days after the return receipt has been filed in the office of the county clerk, presents satisfactory proof of citizenship, the county clerk shall cancel the registration. NRS 293.535(3).

Nevada law also prevents non-citizens from becoming registered in the first place. Nevada's voter registration form contains the question, "Are you a citizen of the United States?", and boxes for the applicant to check to indicate whether or not the applicant is a citizen of the United States. NRS 293.5235(12)(b). A registrant who checks "no" does not meet the qualifications under NRS 293.485 and will not be registered as an active voter on the SVRL. A registrant who willingly falsifies the application in this way is guilty of a class E felony, NRS 293.800(1), and thus subjected to imprisonment of 1-4 years and fined up to $5,000, NRS 193.130(e).

A registrant who fails to check either box will be contacted by their county for more information. If the registrant does not respond, the voter must correct the omission. *See* NRS 293.5235(10).

Additionally, automatic voter registration agencies—which transmit collected information to the Secretary of State's Office for the purpose of registering a person to vote or updating the person's voter registration, *see* NRS 293.57686—only do so when they collect sufficient information that demonstrates a person is qualified to vote, including the person's citizenship, *see* NRS 293.5768(2). The transmission must include "[a] description of the documentation presented to the automatic voter registration agency that indicates the person is a citizen of the United States." NRS 293.57688(1)(f); *see also* NRS 293.5768(3)(b) (specifically prohibiting automatic voter registration agencies from transmitting information about a person who does not provide sufficient information that demonstrates the person is qualified to vote, including citizenship). The automatic voter registration agencies are also specifically prohibited from transmitting any information



101 N Carson Street, Suite 3
Carson City, NV
775.684.5708

about someone who provided documentation such as a permanent resident card. *See* NAC 293.408-409.

10. HAVA requires states to verify voter registration information by mandating that applicants provide certain information under HAVA Section 303(a)(5). Please provide a copy of the voter registration application(s) utilized for in-person voter registration, a link to the State's online voter registration application, and, if applicable, the voter registration application used for same-day registration.

The Nevada Voter Registration Application that is used in person is attached as **Exhibit 2**. The online voter registration application is available at https://registertovote.nv.gov/. Both applications are also used in connection with same-day registration.

Additionally, we note that some voters are registered without a form, either through automatic voter registration or through an electronic pollbook at an in-person voting location.

11. Please describe the verification process under HAVA Section 303(a)(5) that election officials perform to verify the required information supplied by the registrant. Please describe what happens to the registration application if the information cannot be verified.

There are two ways Nevada verifies the validity of the numbers provided to HAVA Section 303(a)(5).

First, many Nevada voters are registered through automatic voter registration conducted by the Nevada DMV. For these individuals, the OLN is automatically entered and verified. *See* NRS 293.5768(1)(a), 293.2725(2)(c).

Second, for voters who register through other processes, the Secretary of State has entered into a cooperative agreement with the DMV to match information in the SVRL with information in the DMV's database in order to verify the accuracy of the information in an application to register to vote. *See* Exhibit 3; *see also* NAC 293.462 (providing that, on each business day, the Secretary of State's Office "compar[es] the driver's license number, identification card number or last four digits of the social security number of the voter set forth in the statewide voter registration list, if any, with the information in the appropriate database of the Department").



101 N Carson Street, Suite 3
Carson City, NV
775.684.5708

On a daily basis, the Nevada Secretary of State's Office submits an inquiry to the DMV so that DMV can compare the information provided by new registrants to its database. When an applicant has provided an OLN, the DMV queries its own database to verify the applicant's information.

When an applicant has not provided an OLN but has provided their SSN4, the DMV sends the applicant's information to Social Security Online Verification pursuant to their contract. Social Security Online Verification then verifies the applicant's information and returns the results to the DMV, which in turn provides the information to the Secretary of State's Office.

Also on a daily basis, the Secretary of State provides the information it receives from the DMV to the counties. Specifically, our Office provides a report of any unmatched voter registration records to the relevant county. The county then reviews the record for any data entry errors. If the county cannot resolve the unmatched status, it sends a notice to the applicant that they must provide additional identification before they will be allowed to vote. *See* NRS 293.2725(1).

12. Provide a copy of the current agreement, under HAVA Section 303(a)(5)(B)(i), between the chief State election official and the State's motor vehicle authority.

A copy of the interlocal contract between SOS and DMV is attached as **Exhibit 3**.

13. Provide a copy of the current agreement between the official responsible for the State's motor vehicle authority and the Commissioner of Social Security Administration under HAVA Section 303(a)(5)(B)(ii).

The Secretary of State's Office is not a party to the agreement between the DMV and the Social Security Administration and therefore is not in possession of a copy. We are working to obtain a copy of the agreement and will provide it to your office as soon as we are able.

14. Under HAVA Section 303(b), describe the State's requirements for an individual to vote if the individual registered to vote by mail and has not previously voted in an election for federal office in the State.

The requirements are set out in NRS 293.269915.



101 N Carson Street, Suite 3
Carson City, NV
775.684.5708

15. Please send us Nevada's current statewide voter registration list. Please include both active and inactive voters.

The Statewide Voter Registration List as of July 9, 2025 is available here.

Note that the vote codes associated with each voter who has vote history are:

- BR - Mail Ballot Received (prior to election, converted to MB after election)
- MB - Mail Ballot Counted
- SB – Sent Ballot (ballot mailed to voter)
- EV - Early Voted
- FW - Federal Write-in
- PP - Polling Place Voted on Election Day
- PV - Provisional Vote

\*          \*          \*

The Secretary of State takes Nevada's HAVA-related obligations very seriously. If you require clarification in connection with the information provided, please contact the undersigned.

Thank you for contacting the Office of the Secretary of State.

Sincerely,

_____

Gabriel Di Chiara
Chief Deputy Secretary of State

# EXHIBIT 3



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

August 14, 2025

<u>Via Mail and Email</u>

The Honorable Francisco V. Aguilar
Secretary of State
101 North Carson Street, Suite 3
Carson City, NV 89701
sosexec@sos.nv.gov; sosmail@sos.nv.gov

Re:     **Complete Nevada's Voter Registration List with All Fields**

Secretary Aguilar:

We have received Nevada's statewide voter registration list ("VRL"). However, as the Attorney General requested, the electronic copy of the statewide VRL must contain *all fields*, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[1] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

We have requested Nevada's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501, *et seq*. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20501(a).

The Help America Vote Act ("HAVA"), 52 U.S.C. § 20501, *et seq*., also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide Voter Registration List requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding there is no private right of action to enforce those requirements in HAVA).

---

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that Justice Department be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq.* Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of 22 months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Nevada's complete and current VRL. The purpose of the request is to ascertain Nevada's compliance with the list maintenance requirements of the NVRA and HAVA.

When providing the electronic copy of the statewide VRL, Nevada must ensure that it contains *all fields*, which includes the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[2] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

Moreover, HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 552a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act.

---

[2] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that Justice Department be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

In charging the Attorney General with enforcement of the voter registration list requirements in HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list.  Any statewide prohibitions are preempted by federal law.

To that end, please provide the requested electronic Voter Registration List[3] to the Justice Department within seven days or by August 21, 2025.

The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS").  Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc:    Mark Wlaschin
       Deputy Secretary for Elections
       101 North Carson Street, Suite 3
       Carson City, NV 89701
       mwlaschin@sos.nv.gov

---

[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

# EXHIBIT 4



101 N Carson Street, Suite 3
Carson City, NV 89701
775.684.5708

August 21, 2025

Ms. Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division
950 Pennsylvania Ave, NW – 4CON
Washington, D.C., 20530
Voting.section@usdoj.gov

Re: U.S. Department of Justice Request dated August 14, 2025

Dear Ms. Dhillon,

We write in partial response to your letter dated August 14, 2025, which requests Nevada's statewide voter registration list (SVRL), "including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number[.]" As explained further below, responding in full will require additional time beyond your requested seven-day deadline.

In a letter dated June 25, 2025, your office requested certain information regarding Nevada's compliance with the Help America Vote Act of 2002 (HAVA). Question 15 specifically requested that our office "[p]lease send [you] Nevada's current statewide voter registration list" and "[p]lease include both active and inactive voters." Accordingly, we submitted Nevada's current SVRL which, as requested, included both active and inactive voters.

Your most recent letter represents a significant departure from your prior request in both scope and basis. You have requested additional, highly-sensitive information, asking that the SVRL include "the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number[.]" Note that this requests differs from the one in the June 25, 2025 letter, which did not—as the more recent letter claims—specify that the SVRL "must contain all fields[.]"

We previously provided your office with the version of the SVRL that complied with your request and with what we generally make available upon request. *See* NRS 293.440; *see also* Secretary of State's Website. Providing a version of the SVRL that includes the last four digits of social security numbers and driver's license numbers would expose highly sensitive information that is confidential, not a public record per Nevada law, *see* NRS 239.010(2)(b), and subject to careful security measures, *see* July 25, 2025 Response

**NEVADA STATE CAPITOL**
101 N. Carson Street, Suite 3
Carson City, Nevada 89701-3714

**PAUL LAXALT BUILDING
COMMERCIAL RECORDINGS**
401 N. Carson Street
Carson City, Nevada 89701-4201

**LAS VEGAS OFFICE**
2250 Las Vegas Blvd North, Suite 400
North Las Vegas, Nevada  89030-5873

**STATE OF NEVADA CAMPUS**
1 State of Nevada Way, 3rd Floor
Las Vegas, Nevada 89119-4339

nvsos.gov



101 N Carson Street, Suite 3
Carson City, NV
775.684.5708

Letter, Question 7. As you can appreciate, given the sensitivity of this data, our office diligently guards it from unlawful disclosure to any entity. Indeed, we are required to do so by the very laws that your letter references. *See, e.g.,* 52 U.S.C. § 21083(a)(3).

In addition, in requesting this information, your most recent letter asserts several sources of authority that were absent from the prior letter and that our office must now consider. As noted above, our office does not turn over sensitive voter data without first assuring itself that both the request and any use of the data are lawful and appropriately protect the privacy of Nevada citizens. Here, too, I am sure you can appreciate that careful legal analysis—that cannot be completed within the short seven-day timeframe—is necessary to ensure that we fulfill our obligations to Nevada residents.

Stepping back, your recent request is unprecedented in its scope, its purported basis, and its purported urgency. You have provided no basis to think that there is any issue with how Nevada meets its obligations under the Help America Vote Act, the National Voter Registration Act, or any other state or federal law. And there is none: Nevada conducts some of the safest, most accessible, and most transparent elections in the nation. That your request is both highly unusual and lacks any articulated basis beyond a desire for the information is all the more reason that my office must carefully review it and ensure that we take all lawful measures to protect the safety and privacy of Nevada citizens' sensitive information.

As you know, there is no deadline in law for Nevada to respond to even a legitimate records request under 52 U.S.C. § 20703. Accordingly, our office will conduct the careful analysis that your request requires and will reach out to you once we have done so.

Thank you for contacting the Office of the Secretary of State..


Gabriel Di Chiara
Gabriel Di Chiara
Chief Deputy Secretary of State

# EXHIBIT 5

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

STATE OF SOUTH CAROLINA      )      IN THE COURT OF COMMON PLEAS

COUNTY OF RICHLAND      )      FIFTH JUDICIAL CIRCUIT

     )

     )      Civil Action No. 2025-CP-40-06539

ANNE CROOK,      )

          *Plaintiff*,      )

     )

vs.      )

     )      **ORDER**

     )

SOUTH CAROLINA ELECTION      )

COMMISSION A/K/A STATE      )

ELECTION COMMISSION,      )

          *Defendant*,      )

     )

HENRY DARGAN MCMASTER, IN HIS      )

OFFICIAL CAPACITY AS GOVERNOR      )

OF THE STATE OF SOUTH      )

CAROLINA,      )

          *Intervenor-Defendant*.      )

---

This matter is before the Court on a Motion for Temporary Injunction filed by Plaintiff, Anne Crook. The motion seeks to prevent or limit the Election Commission's dissemination to DOJ of certain information from the South Carolina statewide voter registration list (VRL), containing Plaintiff's personal information. The Court heard this matter on September 26, 2025, and took the matter under advisement. For the reasons stated below, the Motion is **DENIED**.

### Introduction

Plaintiff is requesting an injunction to prevent the South Carolina Election Commission (Election Commission) from releasing any protected election data to the Department of Justice (DOJ) until there is a memorandum of understanding (MOU) between the two parties. Additionally, Plaintiff requests that this Court review any MOU. In the Election Commission's memorandum in opposition, as well as at oral arguments by their counsel, they have stated point-

blank that they will not release the data to the DOJ without an MOU between the two government agencies. Additionally, counsel stated that the contents of the MOU would be discussed and voted on in open session by the commissioners. This Court denies the drastic remedy of granting injunction for several reasons.

**First**, Plaintiff has failed to prove she will suffer an irreparable harm because the Election Commission has stated it will not release the data without an MOU containing necessary security safeguards to ensure the proper and confidential use of that data and its transmission.

**Second**, Plaintiff has failed to prove there are no adequate remedies at law because she could avail herself to the state and federal tort claims acts if any data is negligently handled in the future.

**Finally**, Plaintiff is not likely to succeed on the merits for several reasons. **1**. The Election Commission is statutorily authorized to engage in the conduct she seeks to enjoin; specifically, South Carolina law vests the Election Commission with the authority to enter data sharing agreements to disclose securely certain voter registration data. **2.** The "right to privacy" constitutional provision does not encompass the sharing of data between the State and the federal government to secure federal elections. **3.** Requesting this Court to mandate an MOU and to assess its adequacy would improperly entangle the judiciary in the routine operations of the Election Commission, which would offend foundational separation of powers principles. **4.** Federal law likely requires the Election Commission to provide the requested information to DOJ.

### Factual Background

On August 6 and 14, 2025, the Department of Justice Civil Rights Division (DOJ) sent letters to the Election Commission, requesting, in sum, South Carolina's VRL. Specifically, in the second letter, DOJ requested "an electronic copy of the statewide voter VRL[, which] should contain *all fields*, which means, [the] state's VRL must include the registrant's full name, date of birth, residential address, [and] his or her state driver's license number or the last four digits of the registrant's social security number . . . ." *See* Compl. at 7–11 (Letter from Harmeet K. Dhillon, Assistant Attorney General Civil Rights Division to Howard Knapp, then-Executive Director, State Election Commission).

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

On August 27, 2025, the Election Commission met to address DOJ's requests. Wooten Aff. ¶ 4. Specifically, the Election Commission directed its staff to confer with DOJ about the prospect of entering into a data sharing agreement as authorized by section 7-5-186(C) of the South Carolina Code of Laws. *Id.* After additional communications with DOJ, on September 3, 2025, the Election Commission and DOJ held a conference call to discuss a possible data sharing agreement. *Id.*¶ 5. Based on that conference call, the Election Commission understands that DOJ is currently developing a Memorandum of Understanding (MOU) that identifies the requested information and addresses the security and privacy concerns raised by the Election Commission. *Id.* ¶ 6. The Election Commission has not yet received the MOU. *Id.* The Election Commission has stated that it will not share any data without a proper MOU in place.

Contesting dissemination of the VRL to DOJ, Plaintiff filed a complaint with a request for injunctive relief and a declaratory judgment in Calhoun County. Ultimately, the case was transferred to Richland County and assigned to the Honorable Daniel M. Coble. The Election Commission filed its Answer on September 25, 2025.

## <u>Legal Standard</u>

An injunction is a "drastic" remedy that "ought to be applied with caution." *Strategic Res. Co. v. BCS Life Ins. Co.*, 367 S.C. 540, 544, 627 S.E.2d 687, 689 (2006). A plaintiff "must establish three elements" to obtain a preliminary injunction: (1) irreparable harm, (2) likelihood of success on the merits, and (3) no adequate remedy at law. *Compton v. S.C. Dep't of Corr.*, 392 S.C. 361, 366, 709 S.E.2d 639, 642 (2011).

### 1. **Irreparable harm**

Plaintiff submits to the Court that she would suffer irreparable harm "if either 1) more of her [personal information] is shared than is permissible under the law or 2) the information is shared without adequate protection." Motion for Temporary Injunction at 11 (Sept. 23, 2025). Transmitting her personal information within the defined confines of an MOU protects against either scenario. Therefore, Plaintiff has failed to identify any sufficient harm—let alone an irreparable harm—she would suffer absent an injunction.

The Election Commission stated in court and in the filings with this Court that they will enter into an MOU with the DOJ that complies with all state law and ensure the protection of any

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

personal information. Additionally, the Election Commission stated that the contents of the MOU would be discussed and voted on at an open hearing. The Election Commission stated in their Memorandum in Opposition to Plaintiff's Motion for a Temporary Injunction:

> Specifically, in recognition of the significant privacy concerns involved, the Election Commission will fulfill its statutory obligations to protect private information and share voter information with DOJ only pursuant to an MOU containing necessary security safeguards to ensure the proper and confidential use of that data and its transmission. Indeed, this explains why the Election Commission has not transmitted the requested information since DOJ first inquired in early August. To appease her concerns, Plaintiff need not look any further than to the MOUs into which the Election Commission routinely perfects when exercising its statutory authority to share voter registration data to carry out its obligation "to maintain accurate voter registration records." *See* Wooten Aff. ¶ 4; S.C. Code Ann. §§ 7-3-20(D)(11), 7-5-186(A). As is standard practice, those MOUs outline the limited purpose for which the shared voter information will be used and the steps taken to protect the confidentiality of that data upon disclosure. For example, such documents ordinarily set forth data use limitations and provide secure transmission protocols and storage and destruction procedures. Any perfected MOU with DOJ should be no different.

Memorandum in Opposition to Plaintiff's Motion for a Temporary Injunction at 5 (Sept. 26, 2025).

Further, Plaintiff's alleged irreparable harm rests on the premise that the Election Commission will not act in good faith or properly carry out the law. Public officials are, absent evidence to the contrary, presumed to act in good faith and follow the laws. *S.C. Jurisprudence*, Evidence § 29 (1999*); see also Toporek v. S.C. State Election Comm'n*, 362 F. Supp. 613 (D.S.C. 1973) (stating that without an evidentiary basis, courts will not assume that state election officials will act arbitrarily in the future). The only evidence in this case is that the Election Commission has acted in good faith in enacting the MOUs with other states to fulfill its statutory duty to maintain accurate voter lists—that is, to prevent voter fraud. Plaintiff has not alleged, and the Court cannot assume, that the Election Commission will do anything other than adhere to state law in any negotiations with DOJ.

## 2. Adequate remedies

Actions for injunctive relief are equitable in nature. *Grosshuesch v. Cramer*, 367 S.C. 1, 4, 623 S.E.2d 833, 834 (2005) (citation omitted). Generally, equitable relief is available only where there is no adequate remedy at law. *Santee Cooper Resort, Inc. v. S.C. Pub. Serv. Comm'n*, 298

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4000639

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

S.C. 179, 185, 379 S.E.2d 119, 123 (1989). Specifically, "An 'adequate' remedy at law is one which is as certain, practical, complete and efficient to attain the ends of justice and its administration as the remedy in equity." *Id*. In the unlikely event that Plaintiff's private information somehow falls in the hands of a "bad actor" as a result of the Election Commission's fulfillment of its statutory obligations under S.C. Code Ann. § 7-5-186(C) as she hypothesizes, she could avail herself to the state and federal tort claims acts. Such claims are more than adequate vehicles for relief such that an injunction is improper.

### 3. Success on the Merits

*Statutory Authorization*

Because the Election Commission is statutorily authorized to engage in the conduct she seeks to enjoin, Plaintiff cannot possibly establish she is likely to succeed on the merits. More specifically, South Carolina law vests the Election Commission with the authority to enter data sharing agreements to disclose securely certain voter registration data.

The South Carolina Constitution mandates the General Assembly to enact legislation providing for the regulation of elections (article II, section 1), the registration of voters (article II, section 8), and "the fulfillment and integrity of the election process" (article II, section 10). Pursuant to that authority, the General Assembly enacted Title 7 of the South Carolina Code of Laws, in turn establishing the Election Commission to oversee the administration of elections and to maintain fair and fraud-free elections. *See* S.C. Code Ann. § 7-3-10(F) (charging the Election Commission with "promulgat[ing] regulations to establish standardized processes for the administration of elections and voter registration that must be followed by the county boards of voter registration and elections").

To that end, relevant here, section 7-5-186(A) requires the Election Commission to establish and maintain a statewide voter registration database and to "conduct an annual general registration list maintenance program to maintain accurate voter registration records in the statewide voter registration system." S.C. Code Ann. § 7-5-186(A). Included in that list is the information the Election Commission collects pursuant to its statutory mandate for contents of voter registration applications. In particular, the application (and therefore the VRL) must contain a registrant's name, sex, race, social security number, date of birth, residential address and may

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4000539

also include driver's license numbers, state-issued identification numbers, telephone numbers, email addresses, mailing addresses, location of prior voter registrations, voter registration agencies, and other data incident to voter registrations. S.C. Code Ann. § 7-5-170(2); *see also* S.C. Code Ann. § 7-5-185(B)(5) (requiring the same information for electronic applications for voter registration).

Furthermore, section 7-5-186(C) expressly provides,

> The State Election Commission *may enter into agreements to share information or data* with other states or groups of states, *as the commission considers necessary*, in order to maintain the statewide voter registration database established pursuant to this section. Except as otherwise provided in this subsection, the commission shall ensure that any information or data provided to the commission that is confidential in the possession of the state providing the data remains confidential while in the possession of the commission. *The commission may provide such otherwise confidential information or data to persons or organizations that are engaging in legitimate governmental purposes related to the maintenance of the statewide voter registration database.*

S.C. Code Ann. § 7-5-186(C) (Emphasis added). The plain language of the statute permits the Election Commission to share the requested information with "organizations" such as DOJ. Before perfecting the agreement, the Election Commission determines whether the DOJ MOU meets the state's statutory requirements for disclosure of voter personal information. If it does not, the Election Commission will not enter the agreement or share the VRL.

Much of the Family and Personal Identifying Information Privacy Protection Act is not relevant to this action. For instance, it requires state agencies to have privacy policies and to inform people that collected information might be disclosed, and it prohibits anyone from using personal information obtained from a government agency from using that information for commercial solicitation. *See* S.C. Code Ann. §§ 30-2-20, -40, -50(A). Specific to the section Crook cites in the heading of her motion, section 30-2-20 permits agencies to share personal information to "fulfill a legitimate public purpose." *Id*. § 30-2-20. Surely protecting the voter rolls fits that description. *See id*. § 7-3-10(G) (Commission must "comply with applicable state and federal election law").

Put simply, the statute's plain text authorizes the Election Commission to engage in the conduct Plaintiff hopes to enjoin. *See Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) ("Under the plain meaning rule, it is not the province of the court to change the meaning of a clear and unambiguous statute.").

*Right to Privacy*

A statute gives a plaintiff the right to sue only if the General Assembly intended to create that right. *Denson v. Nat'l Cas. Co.*, 439 S.C. 142, 151, 886 S.E.2d 228, 233 (2023). "Generally, when a statute does not expressly create civil liability, a duty will not be implied unless the statute was enacted for the special benefit of a private party." *Id.* at 151–52, 886 S.E.2d at 233. Nothing in section 7-5-170 (or section 7-5-186) is for any special benefit of an individual. Instead, these statutes provide the framework how voters register and how the Election Commission handles the voter registration database. Bolstering this conclusion are other parts of Title 7, which expressly provide a person the right to challenge certain Election Commission actions. *See, e.g.*, S.C. Code Ann. §§ 7-5-230(C), 7-5-240.

Because there is no private cause of action conferred under these election statutes, the Plaintiff's standing hinges on whether or not her "right to privacy" has been implicated under South Carolina's Constitution. Article I, section 10 prohibits "unreasonable invasions of privacy." S.C. Const. art. I, § 10. That provision was intended "to take care of the invasion of privacy through modern electronic devices." Committee to Make a Study of the Constitution of South Carolina, 1895, *Minutes of Committee Meeting* 6 (Sept. 15, 1967). It sought "to protect the citizen from improper use of electronic devices, computer data banks, etc." Committee to Make a Study of the Constitution of South Carolina, 1895, *Final Report of the Committee to Make a Study of the South Carolina Constitution of 1895*, at 15 (1969). As originally understood then, this provision has nothing to do with the sharing of data between the State and the federal government to secure federal elections.

This constitutional provision's current jurisprudence is not precisely clear, and there is limited case law on the issue. Therefore, this Court must look to several recent cases to ascertain and interpret the provision in light of the facts of this case. In *Planned Parenthood I*, the South Carolina Supreme Court interpreted the right to privacy as more than merely a search or seizure related protection. However, *Planned Parenthood I* was not directly overruled, but it was clearly supplanted by *Planned Parenthood II*. The first case's two dissenting opinions viewed the right to privacy in a more limited fashion, with Justice James' opinion keeping the provision within the search and seizure framework. *Planned Parenthood II* made it clear that while the majority

opinion ruled that the right to privacy encompassed more than the search and seizure context, it did so only for the purposes of that opinion.

> Second, *Planned Parenthood I* is a highly fragmented decision with five separate opinions. …we likewise decline to revisit the fragmented decision regarding the proper scope of the privacy provision. Rather, in the interest of unity, we will assume only for purposes of our analysis and decision **today** that the privacy provision reaches beyond the search and seizure context to include bodily autonomy. Accordingly, we go no further **today** than referencing *Singleton v. State*, which held that the interests protected by the privacy clause extend to bodily autonomy and integrity.

*Planned Parenthood S. Atl. v. State*, 440 S.C. 465, 481, 892 S.E.2d 121, 130 (2023), *reh'g denied* (Aug. 29, 2023) (emphasis added).  The Supreme Court made clear that in that case they were not making a definitive ruling as to the interpretation of the history and meaning of the constitutional provision in question.  *Id.* at 481 n.9 ("We elect not to address those threshold differences: for purposes of our analysis and decision today, we will cast aside a review of the history and relevance of the 1971 amendments to the state constitution that included the privacy provision, including the work of the West Committee.").

Courts will attempt to avoid making legal interpretations when they are unwarranted and superfluous to the ultimate decision.  The judiciary is not in the business of creating business but rather tasked with the simple job of making decisions related to past conduct and stating rules for predictability of future conduct.  It is often not necessary – and usually unproductive – to create more rules, more interpretations, and more disagreements on issues that are not directly impacted by the ultimate decision. However, because the standing of this Plaintiff hinges on whether or not her right to privacy could be violated, this Court must draw an interpretation as to what the constitutional provision means.

This trial court will never say what the law is or what it ought to be – but it will say what it believes the law is as promulgated by the South Carolina Supreme Court and the South Carolina General Assembly.  Following along the lines of the several opinions in *Planned Parenthood I*, in conjunction with prior precedent, this Court does not believe that this provision is implicated with the sharing of election data.  In his well-reasoned and thoroughly analyzed opinion, Justice James walks through the history and times of the constitutional amendments during the 1960s and 1970s, and particularly, how the right to privacy provision came about.  Without quoting verbatim the

opinion, this Court notes several passages to explain why it believes the right to privacy does not encompass the voter election data at issue in this case.

First, in a letter from the attorney general to West Committee Staff Consultant Robert H. Stoudemire, the attorney general explains the reason why the right to privacy needed to be added to the constitutional protections:

> In the first paragraph, General McLeod acknowledged that the proposed privacy provision "relate[d] to interception of communication which is generally done by electronic means." Letter from Daniel R. McLeod, S.C. Att'y Gen., to Robert H. Stoudemire, Staff Consultant, Comm. to Make a Study of the S.C. Const. (Oct. 2, 1967), 1967 WL 12658, at *1. He then noted an "additional factor [that] may be taken into consideration" is the "protection of privacy in areas such as information gotten through data processing." *Id.* The letter as a whole speaks solely in terms of "securing individual privacy in the field of data processing" and in terms of protecting against intrusions into privacy occasioned by (1) interception of communication and information by electronic means, (2) mass collection of data, (3) unguarded income tax and health information, and (4) unguarded information stored in computers. *Id.*

*Planned Parenthood S. Atl. v. State*, 438 S.C. 188, 339–40, 882 S.E.2d 770, 851–52 (2023), *reh'g denied* (Feb. 8, 2023).  Second, the final report related to this constitutional provision discusses the purpose of the added language:

> **Section J. Searches and seizures.** The Committee recommends that the historic provision on searches and seizures be retained. In addition, the Committee recommends that the citizen be given constitutional protection from an unreasonable invasion of privacy by the State. <u>This additional statement is designed to protect the citizen from improper use of electronic devices, computer databanks, etc.</u> Since it is almost impossible to describe all of the <u>devices</u> which exist or which may be perfected in the future, the Committee recommends only a broad statement on policy, leaving the details to be regulated by law and court decisions.

*Planned Parenthood S. Atl. v. State*, 438 S.C. 188, 338, 882 S.E.2d 770, 850–51 (2023), *reh'g denied* (Feb. 8, 2023).

But even as expanded in *Singleton v. State*, 313 S.C. 75, 89, 437 S.E.2d 53, 61 (1993), article I, section 10 still does not reach the sharing of the voter registration list. That case holds no more than that this provision might extend to "bodily autonomy and integrity." *Planned Parenthood S. Atl. v. State*, 440 S.C. 465, 481, 892 S.E.2d 121, 130 (2023). This Court would thus break new ground by applying article I, section 10 to the voter registration list—and with no way

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

to reconcile that conclusion with the "intent of [article I, section 10's] framers and the people who adopted it." *State v. Long*, 406 S.C. 511, 514, 753 S.E.2d 425, 426 (2014).

And of course, article I, section 10 "draws the line at *unreasonable* invasions of privacy." *Planned Parenthood S. Atl.*, 440 S.C. at 482, 892 S.E.2d at 131 (emphasis added). So even if this provision were implicated by the sharing of voter registration lists, this provision would be violated only if the Commission would act unreasonably to provide information to the federal government. This Court does not believe there would be an unreasonable invasion of privacy for the Election Commission to turn over its data to the DOJ.

### Separation of Powers

Plaintiff seeks an injunction preventing the Election Commission from sharing any such information absent an "adequate" MOU, subject to review by this Court. This Court cannot supersede the Election Commission's discretion to enter such agreements specifically conferred by statute. In a similar vein, in the first instance, the Election Commission alone is charged with ensuring that an MOU "adequately protects" the rights of the South Carolina electorate, including Plaintiff. Requesting this Court to mandate an MOU and to assess its adequacy would improperly entangle the judiciary in the routine operations of the Election Commission. Such involvement would offend foundational separation of powers principles (article 1, section 8 of the South Carolina Constitution) and undermine the independence of the executive agency by inserting judicial oversight into the Election Commission's discharge of its statutory duties and responsibilities. *State ex rel. McLeod v. McInnis*, 278 S.C. 307, 312, 295 S.E.2d 633, 636 (1982) ("One of the prime reasons for separation of powers is the desirability of spreading out the authority for the operation of the government. It prevents the concentration of power in the hands of too few, and provides a system of checks and balances. The legislative department makes the laws; the executive department carries the laws into effect; and the judicial department interprets and declares the laws.").

### Federal law

Federal law likely requires the Election Commission to provide the requested information to DOJ, and while DOJ has also pointed to the National Voter Registration Act and the Help America Vote Act, Title III alone is sufficient to reach that conclusion. Title III requires that, for

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

22 months after a federal election, a state election official "retain and preserve" "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Title III has long been understood to "encompass[], among other things, voting registration records," *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985), which is not surprising given the scope of the statutory text. And since HAVA's enactment two decades ago, registration records must include either "the applicant's driver's license number" or "the last four digits of the applicant's social security number." 52 U.S.C. § 21083(a)(5)(A). The Attorney General (or his representative) may demand in writing "[a]ny record or paper" that a state election official must keep under § 20701. *Id*. § 20703. That demand must simply "contain a statement of the basis and the purpose therefor." *Id*.

DOJ's request for South Carolina's voter registration list fits comfortably within this legal framework. For starters, the voter registration list from the 2024 election is a "record" in a state election official's possession "relating to" the "registration" of voters for the 2024 election. *Id*. § 20701. And that registration now includes either a driver's license number or the last four digits of a Social Security number. *Id*. § 21083(a)(5)(A). DOJ made this request "in writing" and explained its "basis" and "purpose" of ensuring that the State was complying with HAVA and the NVRA. *Id*. § 20703; *see* Compl. Exs. 1 & 2 (DOJ letters).

<u>**Conclusion**</u>

### *State Sovereignty*

This Court finds that federal law likely preempts state law in this area simply because of how this Court has to frame the issue. This case is about whether a citizen can likely succeed on the merits of challenging a State action in compliance with its own interpretation of federal law. And the State at this point has interpreted the law as requiring compliance with the federal request. It is not framed as the State *challenging* the federal request to a state agency. This Court has grave concerns about federal overreach and encroachment over this State's sovereignty. However, because this Court rules on the issue at hand, it does not discuss this issue further. As stated by Chief Justice John Roberts of the United States Supreme Court:

> Outside the strictures of the Supremacy Clause, States retain broad autonomy in structuring their governments and pursuing legislative objectives. Indeed, the

Constitution provides that all powers not specifically granted to the Federal Government are reserved to the States or citizens. Amdt. 10. This "allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States." *Bond v. United States,* 564 U.S. ——, ——, 131 S.Ct. 2355, 2364, 180 L.Ed.2d 269 (2011). But the federal balance "is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *Ibid.* (internal quotation marks omitted). More specifically, " 'the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections.' " *Gregory v. Ashcroft,* 501 U.S. 452, 461–462, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991)

*Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 543, 133 S. Ct. 2612, 2623, 186 L. Ed. 2d 651 (2013).


For the reasons stated above, the Motion for Temporary Injunction is **DENIED**. The Governor's Motion to Dismiss is continued.


**AND IT IS SO ORDERED.**

_____

The Honorable Daniel McLeod Coble


October 1, 2025

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539



Richland Common Pleas

**Case Caption:**    Anne  Crook vs   South Carolina Election Commission , defendant, et al

**Case Number:**    2025CP4006539

**Type:**    Order/Other

So Ordered

s/ Daniel Coble, 2774

Electronically signed on 2025-10-01 11:10:17    page 13 of 13

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539