SADMIRA RAMIC, ESQ. (15984)
CHRISTOPHER M. PETERSON, ESQ. (13932)
AMERICAN CIVIL LIBERTIES
UNION OF NEVADA
4362 W. Cheyenne Ave.
North Las Vegas, NV 89032
Telephone: (702) 366-1226
Facsimile: (702) 718-3213
Emails: ramic@aclunv.org
peterson@aclunv.org

JONATHAN TOPAZ*
New York Bar No. 5671151
WILL HUGHES*
New York Bar No. 5867346
THERESA J. LEE*
New York Bar No. 5022769
SOPHIA LIN LAKIN*
New York Bar No. 5182076
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
Emails: jtopaz@aclu.org
whughes@aclu.org
tlee@aclu.org
slakin@aclu.org

* application for admission pro hac vice forthcoming

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> FRANCISCO V. AGUILAR, in his Official Capacity as Secretary of State for the State of Nevada, <br><br> Defendant. | Case No. 3:25-cv-728 <br><br> **MOTION OF THE ACLU OF NEVADA AND YONAS WOLDU TO INTERVENE AS DEFENDANTS** |

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................... 2

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 3

INTRODUCTION ..................................................................................................................... 3

BACKGROUND ....................................................................................................................... 4

    A.    DOJ's Efforts to Obtain Private Voter Information from Nevada ............................... 4

    B.    Proposed Intervenors ..................................................................................................... 9

ARGUMENT ........................................................................................................................... 10

  I.    MOVANTS ARE ENTITLED TO INTEREVENE AS A MATTER OF RIGHT. .......... 10

    A.    The Motion to Intervene Is Timely ............................................................................. 10

    B.    Proposed Intervenors Have Concrete Interests in the Underlying Litigation ............. 11

    C.    Disposition of this Case May Threaten the Interests of Proposed Intervenors. ......... 13

    D.    Secretary Aguilar's Interests Are Different from Those of Proposed Intervenors ..... 14

  II.    IN THE ALTERNATIVE, THE COURT SHOULD GRANT PERMISSIVE

    INTERVENTION ........................................................................................................... 16

CONCLUSION ........................................................................................................................ 18

The ACLU of Nevada ("ACLUNV") and Yonas Woldu (collectively, "Proposed Intervenors") respectfully move to intervene as Defendants pursuant to Rule 24(a) of the Federal Rules of Civil Procedure or, in the alternative, pursuant to Rule 24(b), and set forth the legal argument necessary to support their motion below. *See* L-R 7-2(a). Proposed Intervenors append to this motion a proposed motion to dismiss by way of a response to the United States' Complaint, while reserving the right to supplement their response to the Complaint within the time allowed for response by Rule 12 after intervention is granted. *See* Fed. R. Civ. P. 24(c).

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## INTRODUCTION

The United States seeks to force Nevada to turn over voters' sensitive personal information and data. It has been widely reported that the United States will use this data to build an unauthorized national voter database and to target voters for potential challenges and disenfranchisement. These efforts are being driven by self-styled "election-integrity" advocates who have previously used ill-conceived database-matching and database-analysis methods to mass-challenge voters and deny the results of elections, and who now serve in or advise the present Administration.

Proposed Intervenors are the ACLU of Nevada, a non-partisan, non-profit organization dedicated to protecting voting rights and civil rights in Nevada, whose own work and whose members' rights are at risk by the relief sought by the United States in this case, as well as Yonas Woldu, a Nevada voter whose personal, private data is at risk in this litigation. Proposed Intervenors have an extremely strong interest in preventing the United States' requests for unfettered and total access to the most sensitive aspects of Nevada's non-public voter data from being used to harass and potentially disenfranchise voters. ACLUNV works to expand access to the ballot and civic engagement, as well as to protect civil liberties, and thus have an interest in protecting the voting and privacy rights of their members and all Nevada voters. This grassroots, volunteer-led work engaging voters is threatened by the United States' request for sensitive, non-public voter data, which risks discouraging Nevadans from registering to vote. And the interests

of Mr. Woldu, as well ACLUNV's members, are also at stake here. Those members include voters who are under particular threat from the United States' requested form of relief, such as voters like Mr. Woldu who are naturalized citizens, voters who have a felony conviction, voters who have previously been registered to vote in another state, voters who registered to vote by mail, and voters whose personal information is especially sensitive and who thus have heightened privacy interests.

Proposed Intervenors are entitled to intervene as of right under Rule 24 because this motion is timely, because both their rights and interests are at stake, and because those rights and interests are not adequately represented by the existing Defendant, who unlike Proposed Intervenors, is a state actor, subject to broader public policy and political considerations external to the legal issues presented in this case. Their unique interests, perspective, and motivation to interrogate the purpose of the United States' sweeping request for non-public Nevada voter data in this case will ensure the full development of the record here and aid the Court in its resolution of this case. Intervention as of right pursuant to Rule 24(a), or in the alternative permissive intervention pursuant to Rule 24(b), should be granted.

## BACKGROUND

### A. DOJ's Efforts to Obtain Private Voter Information from Nevada

Beginning in May 2025, Plaintiff the United States, through its Department of Justice ("DOJ"), began sending letters to election officials in at least forty states, making escalating demands for the production of voter registration databases, with plans to gather data from all fifty states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Dec. 12, 2025), https://perma.cc/MC3M-VS33. On June 25, 2025, it sent such a letter to Secretary Aguilar, Nevada's Secretary of State, demanding the state's current computerized statewide voter registration list. *See* Ex. 1, Letter from Maureen Riordan to Hon. Francisco V. Aguilar dated June 25, 2025, Dkt. No. 3-1, at 2–3 ("June 25 Letter"). The letter also requested information on, among other things, the state's procedure for identifying and removing voter registrations from people who were ineligible to vote due to a felony conviction or lack of U.S. citizenship. *Id.* Secretary

Aguilar responded on July 25, answering the DOJ's questions and providing a link to the publicly-available statewide voter registration list. *See* Ex. 2, Letter from Hon. Francisco V. Aguilar to Maureen Riordan dated July 25, 2025, Dkt. No. 3-1, at 6–16.

On August 14, the DOJ sent a second letter: although the DOJ acknowledged that Nevada had provided its state voter registration list, it now demanded that that Nevada turn over a version of the list, "contain[ing] *all fields*, which includes the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number" ("SSN4")—all within seven days. *See* Ex. 3, Letter from Harmeet K. Dhillon to Hon. Francisco V. Aguilar dated Aug. 14, 2025, Dkt. No. 3-1, at 18–20. The DOJ waved away any privacy issues, claiming that the federal prohibition on sharing voter information obtained under the Civil Rights Act of 1960 with the public was sufficient to assuage concerns. *See id.* at 19 (quoting 52 U.S.C. § 20704).

On August 21, Secretary Aguilar's office responded, noting that it had complied with the DOJ's request by providing the information it generally does to the public, pursuant to Nev. Rev. Stat. § 293.440. *See* Ex. 4, Letter from Gabriel Di Chiara to Harmeet K. Dhillon dated Aug. 21, 2025, Dkt. No. 3-1, at 22–23 ("August 21 Letter"). The letter noted that the DOJ was now requesting additional and "highly sensitive information" that it did not request in the first letter and which is protected from public disclosure under Nevada law. *Id.* at 22. This request was "unprecedented in its scope, its purported basis, and its urgency . . . and lacks any articulated basis beyond a desire for the information." *Id.* at 23. Because of its obligations to protect the confidential information of Nevada voters, Secretary Aguilar's office said it would research the legality of the DOJ's request, rather than responding on the immediate basis it demanded. *See id.*

The United States responded by filing this lawsuit, which is one of at least eighteen that DOJ has initiated recently against states and their top election officials, seeking to compel them to hand over this sensitive voter data.[1] Notably, according to public reporting, DOJ's request for

---

[1] *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025),

private, sensitive voter data from Nevada and other states appears to be in connection with efforts by the United States to construct a national voter database, and to otherwise use untested forms of database analysis in order to scrutinize state voter rolls. According to this reporting, DOJ employees "have been clear that they are interested in a central, federal database of voter information." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. DOJ is coordinating in these unprecedented efforts with the federal Department of Homeland Security (DHS). *Id.*; Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security ("Shorman, *DOJ Sharing Lists with Homeland Security*"); Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09. One recent article extensively quoted a recently departed lawyer from DOJ's Civil Rights Division, describing DOJ's aims in this case and others like it:

> "We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.").

---

https://perma.cc/TQ5T-FB2A; Press Release, U.S. Dep't of Just., *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD; Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA; Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAG. (Nov. 16, 2025), https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

According to additional public reporting, these efforts are being conducted with the involvement of self-proclaimed "election integrity" advocates within and outside government who have previously sought to disenfranchise voters and overturn elections. Those advocates include Heather Honey, who sought to overturn the result of the 2020 presidential election in multiple states and now serves as DHS's "deputy assistant secretary for election integrity."[2] Also involved is Cleta Mitchell, a private attorney and leader of a national group called the "Election Integrity Network," who has promoted the use of artificial intelligence to challenge registered voters.[3] These actors, including some associated with Ms. Honey, have previously sought to compel states to engage in aggressive purges of registered voters, and have abused voter data to mass challenge and attempt to disenfranchise voters in other states. *See, e.g.*, *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 600 n.1 (Pa. Commw. Ct. 2025) (determining that complaint brought by group

---

[2] *See* Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://www.nytimes.com/2025/10/22/us/politics/trump-election-deniers-voting-security.html (documenting "ascent" of election denier Honey); Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAPITAL-STAR (Aug. 27, 2025), https://penncapital-star.com/election-2025/pa-s-heather-honey-who-questioned-the-2020-election-is-appointed-to-federal-election-post/; Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://www.propublica.org/article/heather-honey-dhs-election-security.

[3] *See, e.g.*, Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025, https://www.democracydocket.com/news-alerts/dhs-said-to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters/; *see also* Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025, https://www.npr.org/2025/06/29/nx-s1-5409608/citizenship-trump-privacy-voting-database (reporting that Mitchell had received a "full briefing" from federal officials); *see also* Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024, https://www.propublica.org/article/inside-ziklag-secret-christian-charity-2024-election ("Mitchell is promoting a tool called EagleAI, which has claimed to use artificial intelligence to automate and speed up the process of challenging ineligible voters.").

affiliated with current DHS official Honey challenging Pennsylvania's voter roll maintenance practices pursuant to the federal Help America Vote Act, was meritless).[4]

DOJ's actions also indicate that it may focus on or target specific groups of voters in its use of the requested data. In its letters to Nevada and other States requesting the same private voter data, the DOJ also requested information about how elections officials, among other things, process applications to vote by mail; identify and remove duplicate registrations; and verify that registered voters are not ineligible to vote, such as due to a felony conviction or lack of citizenship.[5] *See* June 25 Letter. The Administration has also confirmed that it was sharing the requested information with the DHS. *See* Jonathan Shorman, *Trump's DOJ Wants State to Turn Over Voter Lists, Election Info*, STATELINE, July 16, 2025, https://stateline.org/2025/07/16/trumps-doj-wants-states-to-turn-over-voter-lists-election-info/ (characterizing letters in nine states); Shorman, *DOJ Sharing Lists with Homeland Security*.

---

[4] *See* Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://www.spotlightpa.org/news/2024/11/mail-ballot-application-challenges-pennsylvania-fair-elections/ (describing mass-challenges and noting connection to Honey and her organization "PA Fair Elections"); *see also* Jeremy Roebuck & Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024, https://www.inquirer.com/politics/election/heather-honey-pa-fair-elections-vote-challenges-pennsylvania-20241101.html (noting sworn testimony regarding PA Fair Elections' involvement in the challenges); Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications Challenged*, NPR, Nov. 5, 2024, https://www.npr.org/2024/11/04/nx-s1-5178714/pennsylvania-mail-ballot-voter-challenges-trump (same).

[5] *See, e.g.*, Br. in Supp. of Mot. to Intervene as Defs., Exhibit No. 1, Letter from Maureen Riordan to Sec'y of State Al Schmidt (June 23, 2025), *United States v. Pennsylvania*, No. 25-cv-01481 (W.D. Pa. Oct. 9, 2025), Dkt. No. 37-1 (Pennsylvania); Mot. for Leave to File Mot. to Dismiss, Exhibit A, Letter from Michael E. Gates to Sec'y of State Jocelyn Benson (July 21, 2025), *United States v. Benson*, No. 25-cv-01148 (W.D. Mich. Nov. 25, 2025), Dkt. No. 34-3 (Michigan); Decl. of Thomas H. Castelli in Supp. of State Defs.' Mot. to Dismiss, Exhibit No. 1, Letter from Michael E. Gates to Sec'y of State Tobias Read (July 16, 2025), *United States v. Oregon*, No. 25-cv-01666 (D. Or. Nov. 17, 2025), Dkt. No. 33-1 (Oregon); Decl. of Malcolm A. Brudigam in Supp. of Defs.' Mot. to Dismiss, Exhibit No. 1, Letter from Michael E. Gates to Sec'y of State Shirley Weber (July 10, 2025), *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. Nov. 7, 2025), Dkt. No. 37-2 (California).

### B. Proposed Intervenors

Proposed Intervenor ACLUNV is a nonpartisan, non-profit organization committed to, *inter alia*, protecting civil rights and voting rights in Nevada. *See* Ex. 2, Declaration of ACLUNV Executive Director Athar Haseebullah ("Haseebullah Decl.") ¶¶ 5–6, 21. ACLUNV expends significant resources conducting on-the-ground voter engagement and assistance efforts, including registering qualified individuals to vote, helping voters navigate the vote-by-mail process, encouraging voters to participate, and assisting voters when they experience problems in trying to vote. *See* Haseebullah Decl. ¶¶ 21–23, 26. The success of these efforts, especially with respect to voter registration, depend on voters' trust that, when they provide personal information to the State as part of the registration process, that information will not be abused, their privacy will be respected, and their right to participate will be honored. *See* Haseebullah Decl. ¶¶ 21–23. Disclosure of the full Nevada voter file would cause ACLUNV to divert resources from its core activities to assist voters and deal with the likely ramifications of voter challenges and disenfranchisement of its members. *Id.* ¶¶ 27–28.

ACLUNV has more than 6,850 active members in Nevada. *See* Haseebullah Decl. ¶¶ 6, 13. Those members include Nevada voters whose personal data will be provided to the federal government if DOJ prevails in this lawsuit, as well as voters who are particularly likely to be caught up in the DOJ's efforts to remove voters from voter rolls, such as: voters who are naturalized citizens, voters previously registered in other states, voters who have voted by mail in Nevada elections and plan to do so in the future, and voters who have requested their information not be disclosed. *See* Haseebullah Decl. ¶¶ 15–18.

Proposed Intervenor Yonas Woldu is a registered Nevada voter and ACLUNV member who has been a resident of the state for more than two decades. *See* Ex. 3, Declaration of Yonas Woldu ("Woldu Decl.") ¶¶ 3–5. Mr. Woldu was born in Eritrea and moved to the United States 31 years ago during the civil war in his home country. *Id.* ¶ 6. Mr. Woldu became a naturalized citizen more than 20 years ago. *Id.* ¶ 7. Voting is extremely important to Mr. Woldu, who enthusiastically participates in elections. *Id.* ¶¶ 7–9. Mr. Woldu believes in the importance of privacy for voters

and is concerned about how DOJ might use his sensitive voter data. *Id.* ¶¶ 8, 11. Mr. Woldu cares about the privacy of his own sensitive, personal data, as well for other naturalized citizens, whom he believes are more vulnerable than other groups to false accusations of illegal voting. *Id.* ¶¶ 11–12.

## ARGUMENT

### I. MOVANTS ARE ENTITLED TO INTEREVENE AS A MATTER OF RIGHT.

Proposed Intervenors are entitled to intervene as of right. Rule 24(a)(2):
> provides that a court must permit anyone to intervene who, (1) on timely motion, (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, (3) unless existing parties adequately represent that interest.

*Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 190 (2022) (internal quotation marks and alterations omitted); *see also Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1177 (9th Cir. 2011). Rule 24(a) must be construed "broadly in favor of proposed intervenors." *Id.* at 1179 (quoting *U.S. v. City of L.A.*, 288 F.3d 391, 397 (9th Cir. 2002)); *see also Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001). Because the Proposed Intervenors easily meet Rule 24(a)'s requirements, Court should grant their intervention as a matter of right.

#### A. The Motion to Intervene Is Timely.

There are three "primary factors" that courts consider in evaluating timeliness: "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *Kalbers v. U.S. Dep't of Just.*, 22 F.4th 816, 822 (9th Cir. 2021) (internal quotation marks and citation omitted). As with the Rule 24(a) inquiry more generally, the Ninth Circuit interprets these factors "broadly in favor of intervention." *W. Watersheds Project v. Haaland*, 22 F.4th 828, 835 (9th Cir. 2022).

This motion is indisputably timely. The United States filed this suit on December 11, 2025, and an Errata to the Complaint was filed on December 12, 2025. Dkt. 1, 4. Upon receiving notice of the suit, the Proposed Intervenors promptly prepared this motion just three days after the case, and two days after the Errata, was filed. *See Kalbers*, 22 F.4th at 825 (interval of "just a few weeks"

"weigh[ed] in favor of timeliness"); *United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1149 (9th Cir. 2010) (motion to intervene was timely where it was filed within four months of when applicants learned of proposed consent decree); *Issa v. Newsom*, No. 20-cv-1044, 2020 WL 3074351, at *2 (E.D. Cal. June 10, 2020) (finding motion timely where "no substantive proceedings ha[d] occurred"). Secretary Aguilar has not yet filed an answer or a motion to dismiss—and indeed has not yet even been served as of this filing—meaning that this litigation is at its earliest stages and intervention will not unduly delay or prejudice the existing parties.

  **B.**  **Proposed Intervenors Have Concrete Interests in the Underlying Litigation.**

Proposed Intervenors have a "sufficient"—*i.e.*, a "significantly protectable"—interest in the litigation. *Donaldson v. United States*, 400 U.S. 517, 531 (1971). To demonstrate a "significantly protectable interest" relating to the subject matter of the action, the intervenor must (1) assert "an interest that is protected under some law," and (2) show that "there is a relationship between its legally protected interest and the plaintiff's claims." *Kalbers*, 22 F.4th at 827 (internal quotation marks and citation omitted). This is a "practical, threshold inquiry"; no "specific legal or equitable interest need be established." *Sw. Ctr. for Biological Diversity*, 268 F.3d at 818 internal quotation marks and citation omitted). This interest requirement is also less stringent than the injury-in-fact requirement for purposes of establishing Article III standing. *See Yniguez v. Arizona*, 939 F.2d 727, 735 (9th Cir. 1991). Here, Proposed Intervenors have multiple, independently sufficient interests that support intervention as of right.

*First*, Mr. Woldu and ACLUNV's other members have a right to privacy in the sensitive voter data the United States seeks. The August 14 Letter demanded that Secretary Aguilar turn over voters' full name, date of birth, residential address, and driver's license number or SSN4. August 14 Letter at 19. This type of sensitive personal information is protected from disclosure by federal law, which prohibits the creation of a national voter database of the type that the United States is reportedly seeking to assemble with the data it seeks. *See* 5 U.S.C. § 552a(e)(7) (provision of the federal Privacy Act prohibiting the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," which necessarily includes

exercising the right to vote). State law also provides Nevada voters with "established protection of personal privacy interests" even in the context of otherwise disclosable public records. *Clark Cnty. Sch. Dist. v. L.V. Review-Journal*, 429 P.3d 313, 320 (Nev. 2018). These privacy interests are significant and inure to Mr. Woldu and to ACLUNV's many members that are registered Nevada voters.

*Second*, and based on DOJ's similar data requests to other States, the data DOJ seeks is likely to be used to challenge the voter registration of certain Nevadans, including voters like Mr. Woldu who are naturalized citizens (who may have indicated they were not a citizen on a government form prior to naturalization); voters with felony convictions; voters who have moved within Nevada or left the state and then returned to Nevada (but might be deemed "duplicate" voters or "out-of-state" voters due to a shoddy matching system); voters who vote by mail; and voters who have requested that their information not be disclosed. *See supra* 5–8 & nn.2–4; Haseebullah Decl. ¶ 15; Woldu Decl. ¶¶ 7, 11–13. Mr. Woldu and ACLUNV members fall within many of these categories. *See* Haseebullah Decl. ¶¶ 15–18; Woldu Decl. ¶¶ 7, 11–13. Mr. Woldu and ACLUNV's members, especially those most likely to be targeted using the information DOJ seeks in this lawsuit, have a concrete interest in not being disenfranchised by so-called "election integrity measures." *See* Woldu Decl. ¶¶ 10–12; Haseebullah Decl. ¶¶ 20–24, 27–28.

*Third*, ACLUNV has protectable interests at stake because its core organizational mission will be harmed if the relief sought is granted. For one, ACLUNV's voter registration activities will be harmed because voters will be chilled from registering and participating if they believe their sensitive personal data will be provided to the federal government. Haseebullah Decl. ¶¶ 22–24. Moreover, ACLUNV will be further harmed if and when the sensitive voter data sought by the United States is then used to engage in mass challenges of registered voters by "election integrity" activists wielding the power of the federal government. *Id.* ¶¶ 27–28. Such mass challenges will force organizational Proposed Intervenors to redirect resources to educating the public about threats to voting rights and mitigating the disenfranchisement of existing voters, and away from their core activities of registering voters and engaging new voters in the democratic process. *Id.*

Courts routinely find that non-partisan public interest organizations, like the organizational Proposed Intervenors, should be granted intervention in election-related cases, demonstrating the significantly protectable interests such organizations have in safeguarding the electoral process. *See, e.g.*, *Texas v. United States*, 798 F. 3d 1108, 1111–12 (D.C. Cir. 2015); *Donald J. Trump for President, Inc. v. Boockvar*, No. 20-cv-2078, 2020 WL 8262029, at *1 (M.D. Pa. Nov. 12, 2020); *Pub. Int. Legal Found., Inc. v. Winfrey*, 463 F. Supp. 3d 795, 799–800 (E.D. Mich. 2020); *Kobach v U.S. Election Assistance Comm'n*, No. 13-cv-04095, 2013 WL 6511874, at *1–2 (D. Kan. Dec. 12, 2013); *LaRoque v. Holder*, 755 F. Supp. 2d 156, 162 n.3 (D.D.C. 2010), *rev'd in part on unrelated grounds*, 650 F.3d 777 (D.C. Cir. 2011). This case is no exception. Indeed, in a similar case brought by the Department of Justice challenging California's refusal to turn over sensitive voter information, such organizations were granted intervention. *See* Order, *United States v. Weber*, No. 25-cv-09149, Dkt. No. 70 (C.D. Cal. Nov. 19, 2025); *see also* Op. & Order, *United States v. Oregon*, No. 25-cv-01666, (D. Or. Dec. 5, 2025), Dkt. No. 52 (granting intervention in Oregon case).

### C.    Disposition of this Case May Threaten the Interests of Proposed Intervenors.

Proposed Intervenors also satisfy the third prong of the intervention analysis because the litigation may result in an order that directly affects their interests. To satisfy Rule 24(a)(2)'s interest impairment prong, intervenors "do not need to establish that their interests *will* be impaired. Rather, they must demonstrate only that the disposition of the action 'may' impair or impede their ability to protect their interests." *Brumfield v. Dodd*, 749 F.3d 339, 344 (5th Cir. 2014) (internal citations omitted). "This burden is minimal." *Grutter v. Bollinger*, 188 F.3d 394, 399 (6th Cir. 1999) (internal quotation marks and citation omitted). Once intervenors establish that they have a significant protectable interest, courts typically "have little difficulty concluding that the disposition" of the case "may, as a practical matter, affect [that interest]." *California ex rel. Lockyer v. United States*, 450 F.3d 436, 442 (9th Cir. 2006).

Here, the threat is significant. The United States proposes to summarily dispose of Nevada voters' interests by obtaining an immediate order compelling the disclosure of private voter data, bypassing the normal civil litigation process and any discovery into "the basis and the purpose" of their request, 52 U.S.C. § 20703. *See* U.S. Mot. to Compel Production of Records, Dkt. No. 2. This attempt to secure the irrevocable disclosure of private voter data to actors who may misuse it in any number of ways, including by mass-challenging or otherwise attacking Nevadans' right to vote, at the very beginning of the case militates strongly in favor of allowing Proposed Intervenors into the case to represent voters' interests now.

### D. Secretary Aguilar's Interests Are Different from Those of Proposed Intervenors.

Courts in this Circuit consider three factors in evaluating adequacy of representation: "(1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 898 (9th Cir. 2011) (internal quotation marks and citation omitted). The Supreme Court has determined that Proposed Intervenors' "burden of making [this] showing should be treated as minimal," and that Proposed Intervenors need not show that representation of their interests *will* be inadequate, but rather only that "representation [of their interests] *may be* inadequate." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) (emphasis added); *see also Berger*, 597 U.S. at 195 (noting that "[the Supreme] Court has described the Rule's test as presenting proposed intervenors with only a minimal challenge."); *Citizens for Balanced Use*, 647 F.3d at 898 (describing burden as "minimal" (internal quotation marks and citation omitted)). Proposed Intervenors need not show that representation of their interests *will* be inadequate, but rather only that "representation [of their interests] *may be* inadequate." *Trbovich*, 404 U.S. at 538 n.10; *see also Citizens for Balanced Use*, 647 F.3d at 898.

1       Proposed Intervenors meet this minimal burden here. As a government official, Secretary Aguilar has a generalized interest in carrying out his office's legal obligations under federal and state laws, and in minimizing burdens on governmental employees and resources. He also must consider broader public policy concerns, in particular the need to maintain working relationships with federal officials. In contrast, Proposed Intervenors will "add [a] missing element" to this litigation, making the existing representation inadequate: the perspective of civil rights groups whose sole commitment is to ensuring access to the ballot and the perspective of individual voters whose very own private information is at risk. *T-Mobile Northeast LLC v. Town of Barnstable*, 969 F.3d 33, 40 (1st Cir. 2020). There may be arguments and issues that the Defendant may not be able or willing to raise that are critical to Proposed Intervenors. For example, individual voters have a more direct injury than states under the Privacy Act for misuse of their personal data, especially given that the Privacy Act grants individuals an express right to bring suit. *See* 5 U.S.C. § 552a(g)(1)(D) ("Whenever an agency fails to comply with any other provision of this section . . . in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency"). As another example, courts have found a risk that political considerations external to the legal issues presented by case like this can motivate elections officials to pursue a settlement that would jeopardize the private information of Mr. Woldu and/or ACLUNV members. *See Judicial Watch, Inc. v. Ill. State Bd. of Elections*, No. 24-C-1867, 2024 WL 3454706, at *5 (N.D. Ill. July 18, 2024) (allowing intervention in NVRA case and observing that "potential intervenors can cite potential conflicts of interests in future settlement negotiations to establish that their interests are not identical with those of a named party"); *cf. Berger*, 597 U.S. at 198 (reversing denial of motion to intervene where North Carolina Board of Elections was "represented by an attorney general who, though no doubt a vigorous advocate for his clients' interests, is also an elected official who may feel allegiance to the voting public or share the Board's administrative concerns").

      These diverging perspectives—between the government's general need to balance various considerations and the Proposed Intervenors' personal and particular interest in the privacy of their

own data—present a classic scenario supporting intervention. *See, e.g.*, *Am. Farm Bureau Fed'n v. EPA*, 278 F.R.D. 98, 110–11 (M.D. Pa. 2011) (allowing public interest groups to intervene, "[b]ecause the EPA represents the broad public interest . . . not only the interests of the public interest groups" and similar stakeholders); *Kobach*, 2013 WL 6511874, at *4 (finding that applicants who had interests in protecting voter rights, particularly in minority and underprivileged communities, may have private interests that diverge from the public interest of an elections agency). Put simply, "the government's representation of the public interest may not be 'identical to the individual parochial interest' of a particular group just because 'both entities occupy the same posture in the litigation.'" *Citizens for Balanced Use*, 647 F.3d at 899 (internal citation omitted). Such is the case here.

Moreover, the United States requests the data at issue pursuant to purported public disclosure provisions in the Civil Rights Act of 1960, but any requests pursuant to those provisions must come with "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. The motivations and purposes for DOJ's requests, including whether they will be used to create an unauthorized national database as has been reported, and whether they are a prelude to mass challenges based on faulty data-matching techniques, are highly relevant and potentially dispositive here. Proposed Intervenors' unique interest as a good-government, pro-democracy organization in pursuing this highly relevant line of factual inquiry and argument is further strong grounds to support intervention.

## II. IN THE ALTERNATIVE, THE COURT SHOULD GRANT PERMISSIVE INTERVENTION

If the Court declines to grant intervention as of right, it should grant permissive intervention under Federal Rule of Civil Procedure 24(b). The Court may utilize its broad discretion to grant permissive intervention when the movant files a "a timely motion" and raises a claim or defenses that shares "a common question of law and fact" with the "main action." *Callahan v. Brookdale Senior Living Cmtys., Inc.*, 42 F.4th 1013, 1022 (9th Cir. 2022) (internal quotation marks and citation omitted). "In exercising its discretion," a court "must consider whether the intervention

will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Other factors that courts often evaluate include "the nature and extent of the intervenors' interest," the "legal position [the intervenors] seek to advance," and "whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *Callahan*, 42 F.4th at 1022 (citation omitted).

Permissive intervention is appropriate here. As discussed above, this motion is timely, coming a mere three days after Plaintiff initiated suit and prior to any discovery or motion practice. *See Kalbers*, 22 F.4th at 825. Because Proposed Intervenors seek to join the case at the earliest possible stage of the litigation, their involvement runs no risk of delaying proceedings.

Moreover, Proposed Intervenors' defense goes directly to the issues already presented in this lawsuit, such as (1) whether federal law permits the United States to force Nevada to give it the personal information it seeks; (2) whether legal protections for individual privacy prohibit the disclosure of that information; and (3) whether the United States' motivations and its potential uses for the data sought are permissible. Proposed Intervenors' distinct perspective on the legal and factual issues before the Court will thus complement or amplify Defendant's arguments and sharpen the issues and the quality of the record, aiding the Court in resolving the issues before it. The proposed "intervention would not add any new issues to this litigation"; instead, Proposed Intervenors are trying to offer their unique perspective, including the perspective of naturalized citizens, to resolve the existing ones. *Ceja-Corona v. CVS Pharmacy, Inc.*, No. 12-cv-1868, 2014 WL 792132, at *3 (E.D. Cal. Feb. 26, 2014).

Because of this unique perspective, district courts routinely grant permissive intervention to advocacy organizations, even when a government party defends a challenged action. *See, e.g.*, *Thomas v. Andino*, 335 F.R.D. 364, 371 (D.S.C. 2020) (granting permissive intervention to state political party in challenge related to election laws); *Tirrell v. Edelblut*, No. 24-cv-251, 2025 WL 1939965, at *4 (D.N.H. July 15, 2025) (allowing "a membership-based organization that represents cisgender athletes" to intervene as a defendant in a suit challenging state restrictions on

transgender athletes); *Judicial Watch, Inc. v. Pennsylvania*, No. 20-cv-708 (M.D. Pa. Nov. 19, 2020), Dkt. No. 50 at 3 (granting permissive intervention in NVRA case to Common Cause and League of Women Voters of Pennsylvania upon finding that "the presence of the intervenors may serve to clarify issues and thereby serve judicial economy" (internal quotation marks, citation, and footnote omitted)); *Donald J. Trump for President, Inc.*, 2020 WL 8262029, at *1 (granting Rule 24(b) motion where voters and organizations "have an interest in the constitutionality of Pennsylvania's voting procedures, which goes to the heart of Plaintiffs' action" (internal quotation marks and citation omitted)).

The recent decision in *Republican National Committee v. Aguilar* is instructive on this point. There, various groups sought to intervene in a case where plaintiffs sought to "compel the State to remove from the [voter] rolls voters whom they claim[ed were] ineligible" to vote. No. 24-cv-518, 2024 WL 3409860, at *1, *3 (D. Nev. July 12, 2024). The court granted permissive intervention, finding that intervenors would "contribute to the just and equitable resolution of the issues before" it because they had a "singular purpose" of "ensur[ing] voters [were] retained on or restored to the rolls," which provided a "counterbalance" to plaintiffs that the state-defendant could not provide due to its "split mission" of "easing barriers to registration and voting" and "protecting electoral integrity." *Id.* at *3. The same reasoning applies here. As such, if it does not grant intervention as of right, this Court should exercise its discretion to allow permissive intervention under Rule 24(b).

## CONCLUSION

For the reasons stated above, the Court should grant the Motion to Intervene as Defendants as of right, or in the alternative, via permissive intervention.

Dated: December 14, 2025                    Respectfully submitted,

/s/ Sadmira Ramic

Jonathan Topaz*  
New York Bar No. 5671151  
Will Hughes*  
New York Bar No. 5867346  
Theresa J. Lee*  
New York Bar No. 5022769  
Sophia Lin Lakin*  
New York Bar No. 5182076  
AMERICAN CIVIL LIBERTIES UNION FOUNDATION  
125 Broad Street, 18th Floor  
New York, NY 10004  
Telephone: (212) 549-2500  
Emails: jtopaz@aclu.org  
whughes@aclu.org  
tlee@aclu.org  
slakin@aclu.org  

Sadmira Ramic (Bar No. 15984)  
Christopher M. Peterson (Bar No. 13932)  
AMERICAN CIVIL LIBERTIES UNION OF NEVADA  
4362 W. Cheyenne Ave.  
North Las Vegas, NV 89032  
Telephone: (702) 366-1226  
Facsimile: (702) 718-3213  
Emails: ramic@aclunv.org  
peterson@aclunv.org  

*\* application for admission pro hac vice forthcoming*

Jonathan Topaz*  
New York Bar No. 5671151  
Will Hughes*  
New York Bar No. 5867346  
Theresa J. Lee*  
New York Bar No. 5022769  
Sophia Lin Lakin*  
New York Bar No. 5182076  
AMERICAN CIVIL LIBERTIES UNION FOUNDATION  
125 Broad Street, 18th Floor  
New York, NY 10004  
Telephone: (212) 549-2500  
Emails: jtopaz@aclu.org  
whughes@aclu.org  
tlee@aclu.org  
slakin@aclu.org  

Sadmira Ramic (Bar No. 15984)  
Christopher M. Peterson (Bar No. 13932)  
AMERICAN CIVIL LIBERTIES UNION OF NEVADA  
4362 W. Cheyenne Ave.  
North Las Vegas, NV 89032  
Telephone: (702) 366-1226  
Facsimile: (702) 718-3213  
Emails: ramic@aclunv.org  
peterson@aclunv.org  

*application for admission pro hac vice forthcoming*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2025, a true and correct copy of the foregoing document was served via the Court's ECF system on all counsel of record and by email on counsel for the United States and Secretary Aguilar.

/s/ Sadmira Ramic