AARON D. FORD
 Attorney General
GREGORY D. OTT (Bar No. 10590)
 Chief Deputy Attorney General
EMILY D. ESPINOSA (Bar No. 16853)
 Deputy Attorney General
Office of the Attorney General
100 North Carson Street
Carson City, NV 89701-4717
T:(775) 684-1195
F: (775) 684-1108
E: gott@ag.nv.gov
    edespinosa@ag.nv.gov

*Attorneys for Francisco Aguilar*
*in his Official Capacity as Secretary of*
*State for the State of Nevada*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:25-cv-00728-ART-CLB |
| Plaintiff, | |
| vs. | |
| FRANCISCO V. AGUILAR, in his Official Capacity as Secretary of State for the State of Nevada, | **NEVADA'S OPPOSITION TO UNITED STATES' MOTION FOR ORDER TO COMPEL RECORDS DEMANDED PURSUANT TO THE CIVIL RIGHTS ACT OF 1960** |
| Defendants | |

As demonstrated in Defendant Secretary of State's ("the Secretary") Motion to Dismiss, the Department of Justice's ("DOJ") demand for a complete, unredacted copy of Nevada's entire Statewide Voter Registration List ("SVRL") is not authorized by the statutes on which it relies and violates Nevadans' privacy rights—and the laws that protect them—in several ways.

Should the Court decline to dismiss DOJ's complaint, however, it should, nevertheless, reject the extraordinary and unlawful process by which DOJ seeks adjudication of its claims. DOJ asks this Court to issue an order to show cause against the Secretary that appears intended to deprive it of virtually all its procedural rights under the

Federal Rules of Civil Procedure.  DOJ goes so far as to suggest that the Court may summarily "order Defendant to produce [the voter database] immediately" with no further process or inquiry into DOJ's objectives and intentions at all—effectively ending the case. Motion for Order to Compel Prod. of Recs. ("Mot.") at 3.  DOJ rests its argument on a provision of Title III of the Civil Rights Act of 1960 ("CRA"), which confers jurisdiction on Federal Courts "by appropriate process to compel the production" of records sought by the Attorney General under 52 U.S.C. § 20703.

As the U.S. Supreme Court has confirmed, this language in the CRA does not abrogate the Federal Rules of Civil Procedure.  To authorize "special statutory proceedings" that deviate from the federal rules, Congress must use language far more specific than that in the CRA—language that actually *describes* the alternate procedure.  The single decades-old, out-of-jurisdiction decision cited by DOJ for the contrary provision is an anomaly that does not even reflect that Circuit's current jurisprudence.

What is more, even if the CRA varied from the Federal Rules, it does not demand the process DOJ proposes, which is both deeply unfair and invites abuse of this Court's processes.  If DOJ's untested allegations in the Complaint are deemed sufficient to survive Nevada's Motion to Dismiss, Nevada must have an opportunity to test them through discovery.  For example, DOJ alleges that it has satisfied the CRA's requirement that it state "the purpose" of its unprecedented demand for voter data by asserting that it is enforcing modest requirements in federal law that Nevada establish a "general program" of list maintenance that makes "reasonable efforts" to remove certain ineligible voters.  52 U.S.C. § 20507(a)(4).  Yet, as the only Court to render a decision in this matter has noted, statements by DOJ officials and other publicly available information suggest that DOJ has other purposes in mind, such as using voter data for criminal or immigration enforcement, feeding the data into an unreliable citizenship-verification system, or forcing all 50 states into an involuntary federal list maintenance program.  *U.S. v. Weber*, 2:25-cv-09149-DOC-ADS (C.D. Cal.) (filed Jan. 15, 2026) ("*Weber*").  Nevada should be permitted to probe whether DOJ has stated the true purpose of its demand, as the CRA requires.  DOJ's other

allegations, such as its allegations of compliance with the Federal Privacy Act, similarly cannot be tested without discovery into DOJ's intended uses of the data.

In short, the Court should deny DOJ's Motion for Order to Compel Production of Records and instead treat this case as what it is: normal civil litigation subject to the rules of civil procedure.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff United States of America, through the Department of Justice, seeks an order directing the Defendant Nevada Secretary of State to turn over a copy of Nevada's computerized voter registration list of its nearly 2.2 million registered voters. Mot. ¶ 4. On June 25, 2025, DOJ demanded Secretary Aguilar provide Nevada's SVRL and demanded that Secretary Aguilar answer several narrative questions about data provided to the Election Assistance Commission and generally about Nevada's practices related to unauthorized registrants. A month later, the Secretary responded to these questions and provided a copy of its publicly available SVRL, as Nevada law provides that any person may request a list of voters. NRS 293.558(1)–(2)(a)–(b). However, Nevada law prohibits providing any entity with a voter's social security, driver's license, or identification card number, and, accordingly, the Secretary did not provide this information. NRS 293.558(1)–(2)(a)–(b).[1] In a follow up letter dated August 14, 2025, DOJ demanded Nevada provide its statewide voter registration list "with all fields" of information associated with each individual voter's registration record, including the sensitive information protected by NRS 293.558(1)–(2)(a)–(b). On August 21, 2025, Secretary Aguilar responded to DOJ's letter, but did not include the unredacted statewide voter registration list. Compl. Exhibit 4 ¶ 22–23. Plaintiff responded by filing this lawsuit—and more than 20 other such lawsuits across the nation.

. . .

---

[1] Additionally, such information is considered confidential and is not a public book or record as pursuant to NRS Chapter 293. NRS 293.558(2)(a)–(b).

As the court in the Central District of California held, the DOJ is not legally entitled to the sensitive voter information it demands. *Weber*, at \*13. Moreover, as the California court further held, the DOJ's demand violates federal laws protecting citizens' personal information: the Privacy Act, the E-Government Act, and the Driver's Privacy Protection Act. Plaintiff is therefore prohibited from collecting the information in the voter list.

In its first and only count, DOJ invokes Title III of the CRA, a Civil Rights era tool that allows the Attorney General to make demands to inspect elections records to investigate and prevent racial discrimination in voter registration and voting. In doing so, Plaintiff distorts the CRA's purpose and operation beyond recognition—and certainly beyond what Congress intended. Plaintiff has not, and cannot, provide a statement of the basis and the purpose for its records demand that is consistent with Title III's narrow scope. DOJ's demand fails for the further reason that DOJ has not met the basic requirement that it articulate *any* basis for its demand, as required by the plain text of the CRA. And, even if it could, nothing in the CRA requires the Secretary to allow inspection of sensitive information or prevents its redaction.

For the reasons set forth below, the Court should therefore deny DOJ's Motion to Compel.

## II.    BACKGROUND

### A.    Nevada's Statewide Voter Registration List.

Since 2003, Nevada has maintained a centralized, top-down database that "collects and stores information related to the preregistration of persons and the registration of electors in all counties in [Nevada]." NRS 293.675(1); *see* S.B. 453, 72nd Leg. Sess. (Nev. 2003). The SVRL contains numerous data fields which can include name, residence address, phone number, email address, current party enrollment, date of birth, and date of registration. *See* NRS 293.507; NRS 293.675. The SVRL also contains the number the voter provided on their voter registration application to verify their identity, which can be that voter's Nevada driver's license number, nondriver identification card number issued pursuant to NRS 293.507(5), or, if they do not have a driver's license number, the last four

4

digits of their social security number.  NRS 293.507(4).  If they have neither, the system assigns them a unique identifier.

Since the SVRL's inception, the Nevada Legislature has charged the Secretary of State with protecting the PII contained within it from unwanted disclosure.  S.B. 453, Sec. 5, 72nd Nev. Legis. Session (2003).  Nevada law designates the unique identification information in the SVRL data as confidential and exempts it from Nevada's public records law.  NRS 293.870(1).  While an exception to that confidentiality law gives the county or clerk discretion to provide SVRL data to government entities upon inquiry, that authority does not extend to disclosure of the social security number, driver's license or identification number, physical address, telephone number, or e-mail address of a registered voter.  *See* NRS 293.558 (1)–(2)(a)(2); (4).

## B.    Federal and State Voter List Maintenance Requirements.

Two federal laws—the National Voter Registration Act of 1993 ("NVRA") and the Help America Vote Act of 2002 ("HAVA")—require States to conduct programs to maintain the accuracy and currency of their voter lists.  The NVRA contains several restrictions designed to protect voters from being wrongfully purged from voting lists. *See, e.g.*, 52 U.S.C. §§ 20507(b), (c)(2)(A), (d).  The NVRA also requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" by reason of death or change in residence.  52 U.S.C. § 20507(a)(4). Subject to the removal restrictions and this modest affirmative requirement, the NVRA leaves it to the States to design and operate their list maintenance programs as they see fit.  *See* 52 U.S.C. § 20507(a)(4) (establishing the obligation of list maintenance but leaving means of maintenance open).

HAVA introduced various election reforms in the wake of the 2000 presidential election, including a requirement that States maintain centralized voter registration databases.  Specifically, states must adopt "a system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." *Id.* § 21083(a)(4)(A).  Importantly, while HAVA clarified that the NVRA's

list maintenance requirements apply to the new voter registration databases, "[n]othing in HAVA broaden[ed] the scope of the NVRA's list-maintenance obligations." *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019). HAVA also, consistent with the NVRA, expressly provides that "specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State." 52 U.S.C. § 21085.

Nevada law provides detailed procedures for maintenance of the SVRL. It authorizes the Secretary to conduct statewide maintenance of the SVRL system and requires him to adopt rules for conducting NVRA-compliant voter list maintenance. *See* NRS 293.675(1) *and* NRS 293.124.[2] Nevada law likewise provides the statutory authority for the interstate exchange of voter-registration information for statewide list maintenance. NRS 293.657(10). Under this authority, Nevada has become a member of the Electronic Registration Information Center ("ERIC") and engages in list maintenance based on reports it receives from that entity. NRS 293.675(3)(h), (10). Importantly, the data shared to ERIC is encrypted via "a cryptographic one-way hash," meaning ERIC receives only encrypted codes ("hashes") representing voter data, which ERIC can compare with hashes from other states for matching purposes but cannot itself decrypt.[3] Nevada law provides no similar authority for the Secretary to share SVRL data with the federal government for list maintenance purposes, let alone unhashed data.

## C. The Department of Justice's demand for unredacted voter data.

In March 2025, President Trump issued an Executive Order ("EO") titled "Preserving and Protecting the Integrity of American Elections." *See* Exec. Order 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025). In addition to purporting to require users of the federally issued voter registration application to submit documentary proof of

---

[2] The Secretary also routinely makes press releases reporting on its voter roll cleanup efforts. *See* Nevada Secretary of State, *Nevada Secretary of State's Office reports voter roll cleanup following the 2024 General Election* (April 14, 2025), https://www.nvsos.gov/sos/Home/Components/News/News/3578/309; *see also* Nevada Secretary of State, *Maintaining Nevada's List of Registered Voters*, https://www.nvsos.gov/elections/voters/voter-roll-maintenance (last visited Jan. 27, 2026).

[3] ERIC, *Technology & Security Overview*, https://ericstates.org/security/ (last visited Jan. 27, 2026); ERIC, *How ERIC Works*, https://ericstates.org/how-does-it-work/ (last visited Jan. 27, 2026).

citizenship—a requirement that has since been enjoined by multiple federal courts[4]—the EO ordered the federal government to acquire and analyze publicly available state voter-list data.  Specifically, the EO directed that:

> the Department of Homeland Security, in coordination with the DOGE Administrator, shall review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. 20507, alongside Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law, for consistency with Federal requirements.

*Id.* at § 2(b)(iii).

To date, Nevada has not received any request directly from the Department of Homeland Security ("DHS") or DOGE for voter data.  However, on June 25, 2025, DOJ sent a letter to the Secretary purporting to request information regarding Nevada's procedures for complying with the statewide voter registration list maintenance provisions of HAVA. Compl. Exhibit 1 ¶ 1–3.  The letter asked a series of questions concerning Nevada's list maintenance program under the NVRA.  *Id.*, Compl. Exhibit 1.  DOJ's letter also included, without any explanation of justification, a demand for Nevada's entire current statewide voter registration list including "both active and inactive voters."  *Id.*, Compl. Exhibit 1. DOJ cited HAVA's list maintenance provision, 52 U.S.C. § 21083(a)(2), as authority for its demand.  *Id.*, Compl. Exhibit 1.

The Secretary responded to DOJ's letter on July 25, 2025, and provided a detailed explanation of Nevada's list-maintenance program.   Compl. Exhibit 2 ¶ 6–16.   The Secretary also answered each of DOJ's questions concerning voter-list maintenance procedures.  *Id.*, Compl. Exhibit 2.  Further, in response to DOJ's demand for Nevada's full unredacted voter list under HAVA, the Secretary provided a link to the voter registration list which had been current and publicly available as of July 9, 2025.  *Id.* Compl. Exhibit 2.

---

[4]  *See California v. Trump*, 786 F. Supp. 3d 359, 396–97 (D. Mass. 2025) (preliminary injunction); *League of United Latin Am. Citizens v. Exec. Off. of President*, No. CV 25-0946, 2025 WL 3042704, at *38 (D.D.C. Oct. 31, 2025) (permanent injunction); *Washington v. Trump*, No. 2:25-CV-00602-JHC, 2026 WL 73866, at *27 (W.D. Wash. Jan. 9, 2026) (permanent injunction).

DOJ, in turn, issued another letter on August 14, 2025, in which it reasserted its demand for the full unredacted voter file containing "all fields," including "date of birth," "state driver's license number," or "the last four digits of the registrant's social security number." Compl. Exhibit 3 ¶ 19. For the first time, however, the DOJ contended that its demand was made under the NVRA and the CRA, in addition to HAVA. *Id.* Compl. Exhibit 3. In response to the Secretary's concern that the demand for data might be inconsistent with federal privacy laws, DOJ stated only that "[a]ll data received from you will be kept securely and treated consistently with the Privacy Act." *Id.* Compl. Exhibit 3. Notably, after referencing the CRA's requirement that DOJ provide "the basis" and "the purpose" for any document requests, the letter stated, "[t]he purpose of the request is to ascertain Nevada's compliance with the list maintenance requirements of the NVRA and HAVA," but it did not identify any basis for the request. *Id.* Compl. Exhibit 3.

The Secretary responded to DOJ's second letter on August 21, 2025. Compl. Exhibit 4 ¶ 22–23. He reiterated his concerns that the demand violated federal privacy laws. *Id.* Compl. Exhibit 4. He also asserted that DOJ likewise failed to provide any basis for its assertion that Nevada did not meet its HAVA obligations and indicated that he will need to conduct a careful review of the request to ensure the safety of Nevadans' private information. *Id.* Compl. Exhibit 4.

DOJ did not respond and instead filed the present action.

## III.    ARGUMENT

### A.    This action should proceed under the Federal Rules of Civil Procedure.

As a general matter, the Federal Rules of Civil Procedure "govern the procedure in all civil actions and proceedings in the United States district courts." Fed. R. Civ. P. 1; *cf. Fed. Rsrv. Bank of Atlanta v. Thomas*, 220 F.3d 1235, 1239 (11th Cir. 2000) (interpreting similar language to "apply to any proceedings in a court of justice by which an individual pursues a remedy which the law affords" (quoting *Weems v. McCloud*, 619 F.2d 1081, 1088 (5th Cir. 1980))). The Supreme Court has repeatedly endorsed this "uniform and regular

civil procedure laid down by the Federal Rules," such that absent "express statutory authorization, courts have been extremely reluctant to allow proceedings more summary than the full court trial at common law." *N.H. Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 407–08 (1960); *accord Daly v. United States*, 393, F.2d 873, 876 (8th Cir. 1968) ("Except when expressly authorized by statute[,] summary procedures are to be substituted for plenary actions only in narrowly defined special situations."); *S.E.C. v. Wencke*, 783 F.2d 829, 837 n.9 (9th Cir. 1986) ("We agree that courts should be 'reluctant' to authorize the use of summary proceedings unless there is a strong reason for doing so."). That "express statutory authorization" consists of "procedures and remedies specifically tailored to a limited subset of cases." *N.Y. Times v. Gonzalez*, 499 F.3d 160, 166 (2d Cir. 2006).

Here, the DOJ filed a traditional civil complaint seeking the production of records. The principal statutes governing that production, namely the CRA, do not expressly or impliedly create a special statutory proceeding, nor do they direct or authorize departure from the usual course of civil litigation.

### 1.    The CRA does not authorize a special statutory proceeding.

The CRA provides, in relevant part, that "[a]ny record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General . . . be made available for inspection." 52 U.S.C. § 20703. Such "demand shall contain a statement of the basis and the purpose therefor." *Id.* It further provides that the federal district court "shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705.

Neither of these provisions expressly authorizes a special statutory proceeding. Nor does either identify "procedures . . . specifically tailored" to an enforcement action under the statute. *Contrast Katzenbach v. McClung*, 379 U.S. 294, 296 (1964) (recognizing that a corresponding provision in the Civil Rights Act of 1964, specifically 42 U.S.C. § 2000a-5, creates a "special statutory proceeding"); *Booth v. Hume Pub., Inc.*, 902 F.2d 925, 931–32 (11th Cir. 1990) (recognizing that Federal Arbitration Act, which sets forth a series of rules and procedures, creates a special statutory proceeding in which the federal rules are

9

applicable only where the Act is silent). In fact, they do nothing "special" at all, in that they refer to an "appropriate process" without further specification or procedural direction.

The U.S. Supreme Court and multiple federal courts of appeal have found that this precise language—"appropriate process"—does *not* give rise to a special statutory proceeding. *See*, *e.g.*, *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964) (concluding that because 26 U.S.C. § 7604(a), a provision of the tax code which permits the enforcement of summonses by "appropriate process," "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply"); *accord United States v. McKay*, 372 F.2d 174, 175 (5th Cir. 1967); *Application of Howard*, 325 F.2d 917, 919 (3d Cir. 1963).

There is accordingly no basis in the statute for treating actions brought under the CRA as anything other than traditional civil proceedings. *Cf. In re Application of Chevron Corp.*, 736 F. Supp. 2d 773, 786 n.56 (S.D.N.Y. 1991) (deeming action to compel discovery under 28 U.S.C. § 1782 to be a suit governed by the Federal Rules of Civil Procedure); *Glen 6 Assocs., Inc. v. Dedaj*, 770 F. Supp. 225, 228 (S.D.N.Y 1991) (refusing to permit summary proceeding in landlord/tenant dispute where "[n]o authorization for summary adjudication . . . is provided in the Federal Rules of Procedure nor in any other statute governing procedure in the district court"). In fact, Nevada is unaware of a single instance in the last five decades in which the Attorney General has sought an order to show cause under her CRA enforcement authority.

DOJ's argument nonetheless rests on a single, near 64-year-old decision from the Fifth Circuit: *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). *See* Memorandum in Support of Motion for Ord. to Compel Prod. Of Recs. ("Memo.") ¶ 5. In that case, the Court noted that the "application" by the Attorney General for an order compelling production did not initiate a traditional civil action, but rather a "special statutory proceeding" in which some Federal Rules of Civil Procedure did not apply. *Id.* at 225–27.

. . .

. . .

*Lynd* does not control and should not guide the Court here.  It is a single decision from outside this Circuit, issued at a unique historical moment at which the validity of "question[s] concerning infringement or denial of voting rights" was beyond dispute.  *Id.* at 228.  The decision has not been cited on a single occasion by any federal court for the proposition that the CRA creates a special statutory proceeding in over 40 years.  Further, while the Attorney General in *Lynd* filed an "application" with the court, *id.* at 225, here DOJ has litigated this case like an ordinary civil proceeding.  It filed a traditional civil complaint and moved for the Court to issue an order to show cause consistent with the Federal Rules.

*Lynd* also does not reflect the current state of law, even in the Fifth Circuit where it originates.  In *Weems*, the Fifth Circuit reasoned that Georgia law created a special statutory proceeding precisely because the statute specified "the issues to be litigated and the procedure to be followed," both of which are absent from CRA.  619 F.2d at 1097.  And while *Weems* cited *Lynd*, it (a) analogized the action at issue in *Lynd* to one brought under Rule 81, *see Weems*, 619 F.2d at 1096 n.35, under which proceedings for the production of documents are by default governed by the Federal Rules, *see* Fed. R. Civ. P. 81(a)(5), and (b) reiterated the Supreme Court's observation in *New Hampshire Fire Insurance Co.*, that "courts have been extremely reluctant to allow proceedings more summary than the full court trial at common law" absent "express statutory authorization."  *Weems*, 619 F.2d at 1095 n.34.

Additionally, *Lynd* reflects a transitional reading of the Civil Rights Act that predates the Supreme Court's clear instructions in *United States v. Powell* that federal enforcement authority may not be expanded by implication beyond the limits prescribed by Congress.  To the extent *Lynd* relies on such an implied expansion, it cannot be reconciled in light of *Powell* and is, at a minimum, confined to its unique historical context.

Therefore, and particularly in the context of this case, there is no basis in the statute or governing case law for reading the CRA as creating a special statutory procedure. . . .

<strong>2.</strong>    <strong>The NVRA does not authorize a special statutory proceeding.</strong>

DOJ does not expressly ask the Court to issue an Order to Show Cause based on the NVRA.  *See generally* Mot. ¶ 2–4.  However, it suggests in passing that the NVRA also creates a special statutory proceeding akin to the one that the Government maintains is created by the CRA.  *See* Memo. ¶ 14 n.3 ("Although this Motion for an Order to Show Cause is made under the CRA, the United States notes that the NVRA includes a similar requirement for production of federal election records.  See 52 U.S.C. §§ 20507, 20510(a).  "[W]hen Congress uses the same language in two statutes having similar purposes … it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."  *Smith v. City of* Jackson, 544 U.S. 228, 233 (2005).    The NVRA does no such thing.

While DOJ was at least able to unearth a decades-old case in support of its position that the CRA creates a special statutory proceeding, it does not cite a single authority suggesting that the NVRA does the same.  Instead, it simply asserts that the NVRA includes a similar production requirement as the CRA and therefore must also create a special statutory proceeding.  *See* Memo. ¶ 14 n.3.    There are multiple flaws with this reasoning.

First, as explained above, the CRA does not create a special statutory proceeding, such that it offers no reason to conclude that NVRA does.

Second, the language in the NVRA does not even include the language that the DOJ relies on in the context of the CRA.  The NVRA requires states to make documents available for public inspection.  *See* 52 U.S.C. § 20507(i)(1), whereas the CRA both refers specifically to requests from the Attorney General, *see id.* § 20703, and grants the district court discretion "by appropriate process to compel the production," *id.*, § 20705.

Third, years of NVRA lawsuits have followed the standard litigation track.  *See, e.g.*, *Jud. Watch v. Ill. State Bd. of Elecs.*, 2024 WL 4721512, No. 24 C 1867 (N.D. Ill. Oct. 28, 2024); *Pub. Int. Legal Found. V. Knapp*, 749 F. Supp. 3d 563 (D.S.C. 2024); *Voter Reference Found., LLC v. Torrez*, 727 F. Supp. 3d 124, 129 (D. Me. 2022).  Therefore, if the language

of the CRA and the NVRA is "materially identical," then the way in which NVRA claims have been litigated for years is an indication that the CRA does not create a special statutory proceeding, and not the other way around.

**B.    Even if the CRA and NVRA create a special statutory proceeding, they do not authorize or require summary relief.**

In special statutory proceedings, consistent with the plain language of Rule 1, the Federal Rules of Civil Procedure are not entirely jettisoned. *See, e.g.*, *Daly*, 393 F.2d at 876 ("[I]n the absence of specific procedures set forth [in statute], the Federal Rules of Civil Procedure are generally applicable."). Instead, courts have recognized that the "Federal Rules of Civil Procedure *may* be applied less rigidly" in such proceedings "where a strict application of the rules would frustrate the statutory purpose." *Booth v. Hume Pub., Inc.*, 902 F.2d 925, 931 (11th Cir. 1990) (emphasis added); *accord Weems v. McCloud*, 619 F.2d 1081, 1094–97 (5th Cir. 1980). In other words, the authorizing statute itself, and the purpose it serves, direct the cadence of litigation against the backdrop of the full federal rules.

Congress did not, in either the CRA or the NVRA, set forth a summary mechanism for adjudicating a records demand. The statutes do not, in fact, identify any procedures for a District Court to follow beyond the CRA's reference to "appropriate process." Without an indication that any Federal Rules of Civil Procedure should not be followed, or express identification of an alternate course of proceeding, the Federal Rules should remain "generally applicable." *Daly*, 393 F.2d at 376.

DOJ likewise has not identified a reason why adhering to any of the Federal Rules of Civil Procedure would frustrate the purposes of the CRA. Permitting adversarial testing of the Government's expansive demand for sensitive records, including discovery on the purpose and basis of that demand, does not undermine enforcement of the Civil Rights protections set forth in the CRA. *Compare Usery v. District No. 22, United Mine Workers of Am.*, 567 F.2d 972, 974 (10th Cir. 1978) (permitting intervention would expand remedies beyond those permitted by statute); *Weems*, 619 F.2d at 1095 (counterclaims would

frustrate summary proceeding created by Georgia statute by delaying and changing the character of judicial determination of the fairness of foreclosure).  Nor, for that matter, has DOJ sought emergency relief in this case or identified any reason why time is of the essence.

Absent such a showing, the adjudication of DOJ's claims, even in the context of a special statutory proceeding, should at the very least include discovery, briefing, and the presentation of evidence to the Court.  *See Wencke*, 783 F.2d at 836–37 (approving use of summary proceedings where "the parties . . . had notice concerning the nature of the proceedings, were permitted extensive discovery, . . . were permitted to file briefs and exhibits with the district court, and . . . except for dispensing with the filing of a complaint and answer, the District Court applied the Federal Rules"); *cf. McGarry's,. Inc. v. Rose*, 344 F.2d 416, 418 (1st Cir. 1965) (requiring at least "an adversary-type hearing" before being required to comply with an administrative summons under the tax code).  A simple summary proceeding is inappropriate and not contemplated by the statutes at issue.

### C.    The United States' demand for records under the CRA is deficient on its face.

DOJ's Motion is also meritless because it rests on a faulty premise.  For DOJ to shift the burden to Nevada to demonstrate why the Court should not order the production of records, DOJ had to establish that it had made a valid demand for those records in the first place.  It did not.

Title III was "designed to secure a more effective protection of the right to vote." *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961).  In furtherance of this purpose, Title III imposes document retention requirements on elections officials: "[e]very officer of election," or designated custodian, "shall retain or preserve, for a period of twenty-two months from the date of any general, special, or primary election" for federal office, "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . . ." 52 U.S.C. § 20701; *id.* § 20706.

If certain conditions are met, DOJ may inspect these records. *Id.* § 20703. As relevant here, the Attorney General must present with the request "a statement of the basis and purpose therefor." *Id.* Title III also includes an enforcement mechanism to compel production of these records. The District Court located where the written demand is made, or where the records are located, has "jurisdiction by appropriate process to compel the production of such record or paper." *Id.* § 20705.

DOJ's demand for Nevada's unredacted voter file is fatally flawed in multiple ways. As for its demand under the CRA, DOJ did not state—or even imply—a basis for its demand as required by statute; failed to identify a purpose for its demands that falls within the scope of the CRA; and, as discussed further below, may not have even disclosed the actual purpose for its records demand at all. Further, DOJ is not the public, such that its failure to comply with the Privacy Act of 1974, the E-Government Act of 2002, and the Driver's Privacy Protection Act renders its demand for Nevada's unredacted voter file invalid. *See* Nevada Secretary of State's Motion to Dismiss ("MTD") ¶ 10–15.

## D.    If DOJ's demand is not facially deficient, then discovery is needed to determine its validity.

Even if the Court were to determine that a special statutory proceeding is authorized, and that DOJ's claims do not fail as a matter of law, an abbreviated order-to-show-cause process would still be fundamentally unfair because it would not allow for the discovery necessary for Nevada to adequately and fairly defend itself against DOJ's claims. Topics of potential discovery include: DOJ's true purpose for seeking highly sensitive voter data from Nevada; its plans for storing using, and disseminating that data both inside and outside the federal government; and its justification for seeking that data may be relevant both to the validity of DOJ's demand and whether to what degree that demand and compliance with it violates the Privacy Act and E-Government Act. Nevada should therefore be permitted to take discovery on these issues before the Court passes

. . .

. . .

15

judgment on whether the requested sensitive voter data must be produced.[5] Any procedure that dispenses with such discovery would inflict irreparable harm on Nevada and its voters whose privacy rights are at stake. *See Weber*, at *4 ("There is an inherent level of trust that comes along with Americans voting locally. . . . The DOJ's request for the sensitive information of Californians stands to have a chilling effect on American citizens like political minority groups and working-class immigrants who may consider not registering to vote or skip casting a ballot because they are worried about how their information will be used. There cannot be unbridled consolidation of all elections power in the Executive without action from Congress and public debate.")

### 1. Nevada should be permitted to probe DOJ's purpose and any basis for its demand under the CRA.

When seeking voting records under the CRA, DOJ must state both "the basis" and "the purpose" for that demand. 52 U.S.C. § 20703. DOJ has asserted that its "purpose" in seeking Nevada's voter file is to "assess Nevada's NVRA and HAVA compliance." "Memo. ¶ 8. Assuming *arguendo* that this is a facially valid purpose if accurate, there are several indications that DOJ's statement of purpose is incomplete, if not outright inaccurate[6]. DOJ's efforts to obtain full voter lists and provide states with feedback on specific registrations, suggest that DOJ intends to operate its own list maintenance program, rather than evaluate whether States' programs make the requisite "reasonable effort" to remove ineligible voters. *See* Memo. ¶ 12–13.; 52 U.S.C. § 21083(a)(4)(A). News reports and statements indicating that DOJ will be sharing voter lists with DHS to "enable DHS

---

[5] Discovery would also ensure Nevada is, at the very least, on no worse footing than would be the recipient of an administrative subpoena. In such cases, pursuant to the corresponding "narrow" but "potent" judicial review, *Secur. & Exch. Comm. V. Arthur Young & Co.*, 584 F.2d 1018, 1024 n.39 (D.C. Cir. 1978), the agency seeking enforcement "must prove that (1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose, and (3) adequately described, and (4) proper procedures have been employed in issuing the subpoena." *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 3–4 (1st Cir. 1996). The discovery described above is relevant to each of these inquiries.

[6] As indicated in President Trump's EO referenced above, the intent of these efforts also appears to be used to compare such numbers against Federal immigration databases, which Nevada has a right to question DOJ about in discovery.

to prevent illegal aliens from corrupting our republic's democratic process," that the DOJ is in talks with DHS to use voter data "in criminal and immigration-related investigations," and is seeking to "establish a national voting database" further cast doubt on the veracity and completeness of DOJ's stated purpose.[7]

DOJ's demand under the CRA is invalid if it has misstated the purpose of the demand. The statute's use of the definite article—"*the* purpose"—indicates that DOJ must state its *actual* purpose, not simply a plausible one. 52 U.S.C. § 20703; *see Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 32 (1st Cir. 2022) (observing that the use of the definite article particularizes the referenced subject and suggests reference to a single object); *see also Weber*, at *13 ("DOJ's Title III claims must be dismissed because the DOJ's proffered statement and purpose, as required under the statute, is both lacking in depth and is contrived."). Further, even if the CRA permitted investigations beyond the context of racial discrimination, it strains credulity to read the CRA as authorizing DOJ to demand election records for purposes beyond its statutory powers (e.g., to perform its own list maintenance), or for purposes entirely unrelated to elections, such as "criminal and immigration-related investigations."

Nevada cannot probe these important factual issues without the opportunity for discovery. And while news reports and statements are suggestive of different or additional DOJ purposes, they are not conclusive. Only discovery will permit Nevada to collect the

---

[7] A September 2025 news article describes an unsigned statement by DHS referencing a "collaboration with the DOJ" that involved "sharing information" and would "enable DHS to prevent illegal aliens from corrupting our republic's democratic process and further ensure the integrity of our elections nationwide" and "scrub aliens from voter rolls." Jonathan Shorman, "DOJ is sharing state voter roll lists with Homeland Security," *Stateline* (Sept. 12, 2025), https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security/. A second article, published by *Reuters*, maintains that based on "government documents seen by Reuters," DOJ was "in talks" with DHS to transfer states' voter data to DHS "for use in criminal and immigration-related investigations." Sarah N. Lynch, "US Justice Dept considers handing over voter roll data for criminal probes, documents show," *Reuters* (Sept. 9, 2025), https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09/. A third article, published in the *New York Times*, suggests that the Trump Administration is seeking to "essentially establish a national voting database." Devlin Barrett and Nick Corasaniti, "Trump Administration Quietly Seeks to Build National Voter Roll," *New York Times* (Sept. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

admissible evidence that it would need to effectively contest whether DOJ has accurately represented the purpose for its demand for Nevada's unredacted voter file.

The same applies to discovery regarding "the basis" for DOJ's demand. Nevada contends in the first instance that DOJ's demand is deficient as a matter of law because it fails to contain *any* statement of the basis for the demand. *See* MTD ¶ 4–5. But should the Court disagree, the statute at the very least requires DOJ to *have* a basis for believing an investigation is necessary when it invokes its powers under the CRA. The known facts make the existence of such a basis doubtful here. Among other things, DOJ's decision to seek voter lists from all 50 states strongly suggests that it is not acting based on a belief that any particular state's list-maintenance program is unreasonable.

Accordingly, if the Court does not dismiss DOJ's claims on their face, Nevada should be permitted to take discovery on whether DOJ had a legitimate basis for its demand.

### 2. Nevada should be permitted to probe whether DOJ's planned uses of Nevada's voter file are consistent with federal privacy laws.

Nevada should have the opportunity to take discovery on whether DOJ has complied with both the Privacy Act and the E-Government Act.

The Privacy Act of 1974 prohibits, among other things, "the creation of secret information systems of data banks on Americans by employees of the departments and agencies of the executive branch." S. Rep. No. 93-1183 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6916, 6917. To this end, it requires federal agencies to publish public notices, called Systems of Records Notices ("SORNs"), with nine categories of information describing each "system of records" held by the agency that contains records about individual Americans. 5 U.S.C. § 552a(e)(4). Such description must include categories of records maintained, categories of individuals contained in those records, expected "routine uses" of the records, categories of users of the records, and policies and procedures governing access, storage, and disposal. *Id.*

. . .

. . .

The relevant agency must provide notice in the Federal Register 30 days before "any new use or intended use of the information in the system" and allow the public to submit comments on the proposed use. *Id.* § 552a(e)(11). Notice must also be provided to the Office of Management and Budget and Congress. *Id.* § 552a(r).

The Privacy Act also flatly prohibits federal agencies from maintaining records "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). The voter file contains precisely such data, including each voters' party enrollment, if any, and a history of whether they voted in each election. DOJ's demand for the voter file violates this provision as a matter of law. Nevada should be permitted to take discovery on whether the voter file will, in fact, be used by DOJ for "authorized law enforcement activity." For example, if, as reports suggest, DOJ is seeking the list in collaboration with DHS to attempt to identify noncitizens, such a purpose would not be authorized by the NVRA and HAVA grant of enforcement authority to DOJ, as neither statute requires States' list maintenance programs to monitor voters' citizenship status. *See* 52 U.S.C. §§ 20507(a)(4); 21083 (a)(4)(A); *Snipes*, 935 F.3d at 1202.

Additionally, under the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, federal agencies are required to conduct a "privacy impact assessment" prior to taking various actions that impact personal privacy." *Id.* § 208(b)(1)(A)–(B). Such actions include any new collection of information that is collected, maintained, or disseminated using information technology involving "any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." *Id.* § 208(b)(1)(A)(ii).

Nevada's voter file, which includes names and mailing addresses and consists largely of voters' answers to standardized questions on the voter registration application, falls within the strictures of the privacy impact assessment requirement. Yet DOJ does not

allege it has completed any applicable privacy impact assessment in its Complaint. Nor did DOJ respond to the Secretary of State's questions from his August letter regarding whether DOJ complied with the E-Government Act. Unless DOJ is willing to concede that it has not conducted the required privacy assessment, Nevada should be permitted to take discovery to establish that DOJ's demand for the voter file violates the E-Government Act. *See Weber*, at *25 ("This appears to be a telltale fishing expedition. District Courts do not 'condone the use of discovery to engage in fishing expeditions when the Plaintiff has no basis other than gross speculation to support their claims." (internal quotations omitted)).

## IV. CONCLUSION

For the reasons above, the Court should deny the DOJ's Motion for Order to Compel Production of Records Pursuant to 52 U.S.C. § 20701.

Respectfully submitted this 28th day of January 2026.

AARON D. FORD
Attorney General

By: /s/ *Emily D. Espinosa*
    EMILY D. ESPINOSA
    Deputy Attorney General
Nevada Bar No. 16853
Office of the Attorney General
100 N. Carson Street
Carson City, Nevada 89701
(775) 684-1195
edespinosa@ag.nv.gov

*Attorneys for Francisco Aguilar*
*in his Official Capacity as Secretary of*
*State for the State of Nevada*

**CERTIFICATE OF SERVICE**

I certify that I am an employee of the Office of the Attorney General, State of Nevada, and that on January 28, 2026, I filed the foregoing document ***Nevada's Opposition to United States's Motion for Order to Compel Records Demanded Pursuant to the Civil Rights Act of 1960*** via this Court's electronic filing system. Parties that are registered with this Court's EFS will be served electronically.

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ERIC NEFF
Acting Chief, Voting Section
Civil Rights Division

BRITTANY E. BENNETT
Trial Attorney, Voting Section
Civil Rights Division

U.S. DEPARTMENT OF JUSTICE
4 Constitution Square
150 M. Street, Room 8.141
Washington, D.C. 20002
Tel: (202) 704-5430
Brittany.Bennett@usdoj.gov

SIGAL CHATTAH
First Assistant United States Attorney
District of Nevada
Nevada Bar No. 8264
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
Sigal.Chattah@usdoj.gov

*Attorneys for Plaintiff, UNITED STATES OF AMERICA*

/s/ *Mark Cryer*
AG Legal Secretary