HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

BRITTANY E. BENNETT
Trial Attorney, Voting Section
Civil Rights Division

JAMES T. TUCKER
Trial Attorney, Voting Section
Civil Rights Division
Nevada Bar No. 12507

U.S. Department of Justice
4 Constitution Square
150 M Street, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Brittany.Bennett@usdoj.gov
James.T.Tucker@usdoj.gov


Attorneys for United States of America

SIGAL CHATTAH
First Assistant United States Attorney
District of Nevada
Nevada Bar No. 8264
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
Sigal.Chattah@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

UNITED STATES OF AMERICA

        Plaintiff,

        v.

FRANCISCO V. AGUILAR, in his Official Capacity as Secretary of State for the State of Nevada,

        Defendant(s).

Case Number: 3:25-cv-00728

**UNITED STATES' CONSOLIDATED MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS (DOC. 42) AND IN REPLY TO INTERVENORS' OPPOSITION (DOC. 37) TO ITS MOTION TO COMPEL (DOC. 2)**

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...........................................................................................1

II.   BACKGROUND ............................................................................................2

III.  THE UNITED STATES IS ENTITLED TO PRODUCTION OF THE FEDERAL
ELECTION RECORDS IT HAS DEMANDED UNDER TITLE III OF THE CRA ...................5

    A.  The Federal Rules of Civil Procedure are inapplicable to motions to compel under
Section 305 of the CRA. ....................................................................................5

    B.  Title III of the CRA does not require allegations that the federal election records
demanded are needed to investigate race-based denial of voting rights. ....................11

    C.  Defendants cannot challenge the Attorney General's basis and purpose to investigate
Nevada's HAVA and NVRA compliance....................................................................14

    D.  Nevada's SVRL falls within Section 301's broad definition of "all records and papers"
relating to registration to vote in federal elections. .................................................17

IV.   THE UNITED STATES IS COMPLYING WITH FEDERAL PRIVACY LAWS ............22

    A.  The United States is complying with the Privacy Act...................................................23

    B.  The First Amendment does not prohibit access to data the United States needs for its
HAVA and NVRA claims..........................................................................................25

    C.  The E-Government act does not prevent the United States from obtaining data
supporting its HAVA and NVRA claims......................................................................25

    D.  The Driver's Privacy Protection Act does not allow Secretary Aguilar to deny the
United States list maintenance data.........................................................................27

V. CONCLUSION ...............................................................................................28

iii

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960).........................passim

4

*Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006)....................................................9, 10

5

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ...................................3

6

*Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020)............................................14

7

*Coal. for Open Democracy v. Scanlan*,

8

    No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025)............................22

9

*Coleman v. Campbell*, 208 F. Supp. 199 (S.D. Miss. 1962) ................................12, 16

10

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963)......................................5, 12, 16, 22

11

*Cook v. Peter Kiewit Sons Co.*, 775 F.2d 1030 (9th Cir.1985) .................................10

12

*Ebert v. Poston*, 266 U.S. 548 (1925) ......................................................13

13

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Elec. Integrity*,

14

    266 F. Supp. 3d 297 (D.D.C. 2017) ....................................................26

15

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Elec. Integrity*,

16

    878 F.3d 371 (D.C. Cir. 2017) .........................................................26

17

*Ex Parte Siebold*, 100 U.S. 371 (1879)......................................................3

18

*Exp. Grp. v. Reef Indus., Inc.*, 54 F.3d 1466 (9th Cir. 1995) .................................10

19

*Foster v. Love*, 522 U.S. 67 (1997) .........................................................3

20

*Franklin v. Or. Welfare Div.*, 662 F.2d 1337 (9th Cir. 1981) ...............................10

21

*In re Duncan,* 713 F.2d 538 (9th Cir. 1983) ..................................................9

22

*In re Gordon*, 218 F. Supp. 826 (S.D. Miss. 1963).............................................10

23

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)........................................passim

24

*Koster v. Harris*, 847, F.3d 646 (9th Cir. 2017)..............................................10

25

*Pure Oil Co. v. Suarez*, 384 U.S. 202 (1966)..................................................9

26

*Reno v. Condon*, 528 U.S. 141 (2000) .......................................................27

27

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995)......................................3

28

*United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846 (W.D. La. 1960) ...........5, 6

*United States v. Benson*, Case No. 1:25-cv-01148-HYJ-PJG (W.D. Mich. Feb. 10, 2026) ..........10

*United States v. Bisceglia*, 420 U.S. 141 (1975) .................................................................................6

*United States v. Cotton*, 535 U.S. 625 (2002) ....................................................................................9

*United States v. Great N. Ry. Co.,* 343 U.S. 562 (1952) ....................................................................14

*United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269 (1929) ...........................................................13, 14

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) .................................................................6, 22

*United States v. Pan-Am. Petroleum Co.,* 55 F.2d 753 (9th Cir. 1932) .......................................13

*United States v. Powell*, 379 U.S. 48 (1964) ..............................................................................6, 7, 8

*United States v. Raffensperger*, Case No. 5:25-cv-548-CAR (M.D. Ga. January 23, 2026) .........10

*Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006) ...............................................................................9

**Statutes**

18 U.S.C. § 2721 ...................................................................................................................................27

18 U.S.C. § 2725 ...................................................................................................................................27

52 U.S.C. § 20507 ..........................................................................................................................3, 21

52 U.S.C. § 20510 .................................................................................................................................3

52 U.S.C. § 20701 ........................................................................................................................passim

52 U.S.C. § 20703 ........................................................................................................................passim

52 U.S.C. § 20705 ........................................................................................................................1, 3, 15

52 U.S.C. § 21083 ...................................................................................................................3, 4, 21

52 U.S.C. § 21111 .................................................................................................................................3

CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960) ....................................................................10, 11

The E-Government Act of 2002, Pub. L. No. 107–347, § 208 ...............................................25, 26

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 ...................................................................................................................2

**Legislative Materials**

106 Cong. Rec. 7767 ...........................................................................................................................12

H.R. Rep. 107-329, pt. 1 (2001) .........................................................................................................13

1

Plaintiff United States of America respectfully submits this Memorandum of Law: (1) in

2

opposition to the Motion to Dismiss by Defendant Secretary of State for the State of Nevada,

3

Francisco Aguilar ("Secretary Aguilar") (Doc. 42); and (2) in Reply to the Opposition to the United

4

States' Motion to Compel (Doc. 2) by Proposed Intervenors Jacqueline Sue Bird, Institute for a

5

Progressive Nevada, NAACP Conference of Idaho, Nevada, and Utah, Nevada Alliance for Retired

6

Americans ("Defendant-Intervenors") (Doc. 37).[1] Collectively, Secretary Aguilar and Proposed

7

Defendant-Intervenors are referred to as the "Defendants." The United States submits this

8

consolidated Memorandum to facilitate the Court's review of the duplicative and overlapping

9

arguments made by the Defendants.

10

## I.    INTRODUCTION

11

The Attorney General of the United States brought this case as part of her investigation of

12

Nevada's list maintenance practices under the Help America Vote Act ("HAVA"), and the National

13

Voter Registration Act ("NVRA"). The United States engaged in repeated correspondence with

14

Secretary Aguilar, requesting his cooperation in providing federal election records necessary to its

15

assessment in a manner consistent with federal privacy law. Those efforts were met by Secretary

16

Aguilar's refusal to produce records as mandated by federal law and necessary to evaluate

17

compliance with federal election laws. This action followed. *See* Compl., Doc. 1.

18

Title III of the Civil Rights Act ("CRA") provides the principal statutory authority for the

19

United States to immediately obtain federal election records including Nevada's statewide Voter

20

Registration List ("SVRL"). Those provisions broadly authorize the Attorney General to compel

21

production of "all records and papers" that "come into … possession" of the officers of election

22

relating to registration or other acts requisite to voting in federal elections. 52 U.S.C. § 20701; *see*

23

*also* 52 U.S.C. § 20705 (authorizing the Attorney General to bring an action to compel the

24

production of federal election records demanded under Section 303 of the CRA). In that manner,

25

Title III is unique because it is purely an investigative tool. As such, it enables the Attorney General

26

27

[1] The combined brief complies with the total page limit for a separate opposition and a reply brief.

28

See LR 7-3(b).

1

to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[2]

The CRA restricts the Court to a "severely limited" inquiry: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that she satisfied the first three elements. *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. § 20703.

As discussed below in detail, the record before the Court demonstrates that the United States has satisfied each of these requirements. In contrast, Defendants have wholly failed to establish that there remains any "matter[] open for determination" which would provide a basis for the motion to dismiss. *Lynd*, 306 F.2d at 226. Therefore, the United States' Motion to Compel (Doc. 2) should be granted, the Motion to Dismiss (Doc. 42) should be denied, and an order compelling production of Nevada's SVRL and other responsive federal election records should be entered.

## II.    BACKGROUND

While the United States Constitution invests states with broad powers over the conduct of federal elections, it also explicitly authorizes Congress to override those state choices. The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines

---

[2] Circuit caselaw addressing the CRA in any depth has been confined to courts within the Fifth Circuit in the early years following the CRA's enactment. The United States is unaware of any circuit courts disagreeing with the Fifth Circuit's approach to the CRA. Recently two district courts in this Circuit and one district court in the Sixth Circuit reached a contrary conclusion. However, those decisions are burdened by erroneous applications of the statute. *See infra* at 8-12, 19 n.8.

to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States. *Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995)) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the three statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i)(1). Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA). The Attorney General likewise enforces the NVRA's requirement that all states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of federal elections. *See* 52 U.S.C. §§ 20510(a), 20507(b), 20507(a)(4).

Acting pursuant to the United States' authority to enforce these federal election statutes, on June 25, 2025, the Department of Justice sent Secretary Aguilar, Nevada's chief elections officer, a letter requesting, *inter alia*, a copy of Nevada's SVRL. Decl. of Eric Neff ("Neff Decl.") ¶ 4, Doc

3-2; 6/25 Ltr., Ex. 1 to Doc. 3-1. On July 25, 2025, Secretary Aguilar responded, denying that request. Neff Decl. ¶ 5, Doc. 3-2; 7/25 Ltr., Ex. 2 to Doc. 3-1. On August 14, 2025, the Attorney General, through her representatives, sent a letter to Secretary Aguilar demanding the State's unredacted SVRL containing all fields. *See* Neff Decl. ¶¶ 6-10, Doc 3-2; 9/8 Ltr., Ex. 3 to Doc. 3-1. As stated in the letter, the basis for the demand was Title III of the CRA and the purpose was to ascertain Nevada's compliance with the list maintenance requirements of the NVRA and HAVA. *Id.* The letter informed Secretary Aguilar that the list is subject to federal privacy protections, including Section 304 of the CRA. *Id.* It further informed him that the statewide voter registration list could be produced via encrypted email or using the Department of Justice's secure file-sharing system. *Id.*

On August 21, 2025, Secretary Aguilar rejected the Attorney General's written demand, alleging that it had no basis and did not address the Secretary's privacy concerns. Neff Decl. ¶ 11, Doc. 3-2; 8/21 Ltr., Ex. 4 to Doc. 3-1. The letter claimed that the Secretary's office would conduct "the careful analysis that [the Attorney General's] request requires and will reach out to you once we have done so." *Id.* However, over three months later, the Attorney General had neither received the requested SVRL nor the Secretary's "analysis." On December 11, 2025, the Attorney General then instituted these summary proceedings to compel production. *See* Compl., Doc. 1.

As explained in the attached second declaration of Eric Neff, the United States seeks these documents for one purpose only: to evaluate Nevada's compliance with the list maintenance provisions of HAVA and the NVRA, and if appropriate, to bring an enforcement action. *See* Second Declaration of Eric Neff ("2d Neff Decl.")) ¶ 2. HAVA requires that "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes" the applicant's driver's license number or if that is unavailable, the last four digits of the Social Security number. 52 U.S.C. § 21083(a)(5)(A)(i). That information is necessary to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections. 2d Neff Decl. ¶¶ 3-4.

4

### III. THE UNITED STATES IS ENTITLED TO PRODUCTION OF THE FEDERAL ELECTION RECORDS IT HAS DEMANDED UNDER TITLE III OF THE CRA

Defendants misapprehend the nature of a CRA claim by erroneously suggesting the Court should apply the Federal Rules of Civil Procedure to the demand for records under the CRA. They incorrectly maintain that Title III of the CRA applies to only discrimination claims. They ask the Court to ignore caselaw under the CRA and allow an impermissible challenge to the basis and purpose of the Attorney General's written demand. Likewise, they assert that the Court should undermine the Attorney General's enforcement authority by rewriting the congressional mandate in the CRA. In place of producing all election records requisite to voting in federal elections, Defendants invite the Court to narrow the mandate to encompass only publicly available records. For the reasons discussed below, Secretary Aguilar's Motion to Dismiss (Doc. 42) should be denied, the United States' Motion to Compel (Doc. 2) granted, and Secretary Aguilar compelled to produce the demanded federal election records including Nevada's SVRL.

### A. The Federal Rules of Civil Procedure are inapplicable to motions to compel under Section 305 of the CRA.

Defendant-Intervenors argue that the Federal Rules of Civil Procedure govern these proceedings. *See* Def.-Intervenors' Resp. in Opp'n, Doc. 37 at 3-4. They repeat what the Fifth Circuit has described as "a basic misconception … concerning a Title III proceeding." *Lynd*, 306 F.2d at 225.

The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is … purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). It does not require known violations of federal law. In that manner, Title III enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228. Contrary to what the Defendants argue, no factual allegations of a substantive violation of federal

law are required. Instead, "Congress has specifically committed the investigative responsibility to the Attorney General and has equipped [her] with machinery thought suitable for the effective fulfillment of that obligation" through Title III of the CRA.[3] *Id.* at 230. That approach makes sense. The United States cannot be expected to effectively enforce federal election laws such as HAVA and the NVRA if the Attorney General is required to allege facts from federal election records that state officers of election have denied to her. *See id.* at 227 (the Attorney General's "right to records does not require that [she] show [she] could win without them").

The Attorney General's filing of an application for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Id.* at 225. It is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id.* In structuring the statute in this way, Congress has indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 852 (comparing CRA applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations"). The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *See Citizens Councils*, 187 F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34 … is to give a party litigant the right to have records produced *after* suit has been filed." *Id.* (emphasis added). To summarize, "[t]here is no place for any other procedural device or maneuver," including the motion to dismiss presently before the Court, in response to a CRA claim.

---

[3] Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Bisceglia*, 420 U.S. 141, 148 (1975). The Supreme Court has recognized that statutes that vested investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). The investigative powers that the Attorney General derives from Title III fall comfortably within this paradigm.

1    *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81 (summarizing other federal claims to which the

2    Federal Rules of Civil Procedure do not apply).

3         Defendant-Intervenors argue that *Lynd* is irreconcilable with *United States v. Powell*, 379

4    U.S. 48, 58 n.18 (1964), which applied the Federal Rules of Civil Procedure regarding an IRS

5    administrative summons. *See* Def.-Intervenors' Resp. in Opp'n, Doc. 37 at 3-4. A recent decision

6    in *United States v. Oregon*, Case No. 6:25-cv-01666-MTK, slip op. (D. Or. Feb. 5, 2026) (attached

7    to 2d Neff Decl. as Ex 13), adopted Defendant-Intervenors' reasoning and incorrectly concluded

8    that *Powell* squarely rejects the Fifth Circuit's holding in *Lynd* that Title III of the CRA is a special

9    statutory proceeding where the Federal Rules of Civil Procedure do not apply. *Oregon*, slip op. at

10   15. In *Powell*, the Supreme Court made the unremarkable observation that because section 7604(b)

11   of the Internal Revenue Code ("IRC") "contains no provision specifying the procedure to be

12   followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply…" 379

13   U.S. at 58 n.18. However, the *Oregon* court applied a much broader construction of *Powell* than

14   the Supreme Court intended.

15        The *Oregon* court found that *Powell* involved interpretation of "a similar statute" to Title

16   III of the CRA, and the decision's admonition that "the court may 'inquire into the underlying

17   reasons for the examination [of records]'" therefore applied to the CRA. *Oregon*, slip. op. at 15

18   (quoting *Powell*, 379 U.S. at 58). Although the quoted language from *Powell* is correct, *see id.*, the

19   *Oregon* court omitted any explanation that the quoted language referred to a process expressly

20   provided in the IRC that is missing from the CRA. The Supreme Court explained that judicial

21   inquiry was appropriate where asked to enforce an administrative summons under the IRC to

22   determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer

23   or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the

24   good faith of the particular investigation." *Id.* That inquiry was permitted because it was

25   specifically authorized by section 7605(b) of the IRC, which prohibited the Government from

26   subjecting a taxpayer "to unnecessary examination or investigations." *Id.* at 52-53 (quoting 26

27   U.S.C. § 7605(b)). However, no similar language limits the Attorney General's authority to compel

28

1   records under the CRA. *See* 52 U.S.C. §§ 20701-20706. Nor does the CRA provide any process

2   for officers of election to object to Title III proceedings being initiated against them. *See id.*

3         Moreover, even with language in the IRC limiting records to "necessary" investigations,

4   the Supreme Court made clear "[t]here is no intimation in the legislative history that Congress

5   intended the courts to oversee the Commissioner's determinations to investigate." *Powell*, 379 U.S.

6   at 56. Strong deference is given to the Government, and "'[] does not depend on a case or

7   controversy for power to get evidence but can investigate merely on suspicion that the law is being

8   violated, *or even because it wants assurance that it is not.*'" *Id.* at 57 (quoting *Morton Salt*, 338

9   U.S. at 642-43) (emphasis added). *Powell* is completely consistent with *Lynd* and in no way restricts

10  records demands under the CRA to the statutory limitations that Congress included in the IRC. [4]

11        Defendant-Intervenors also cite as support the District Court ruling in *United States v.*

12  *Weber*, Case No. 2:25-cv-09149-DOC-ADS, slip op. (C.D. Cal. Jan. 15, 2026) (attached to 2d Neff

13  Decl. as Ex. 14). Def.-Intervenors' Resp. in Opp'n, Doc. 37 at 3-4. In *Weber*, the Court began its

14  analysis of the pending motions to dismiss by acknowledging it lacked jurisdiction to do so:

15  "California argue[d] that [the] Court lack[ed] jurisdiction to adjudicate the claim for violation of

16  Title III of the … CRA … because DOJ's demand was made to the California Secretary of State's

17  Sacramento address and the records sought [were] located there." *Weber*, slip op. at 12. The Court

18  agreed, finding "this argument persuasive," because the case was brought in the Central District

19  instead of the Eastern District, where the Secretary's office and records were kept. *Id.* at 12 & n.13.

20  Section 305 is explicit on this point. It provides, "The United States district court for the district in

21  which a demand is made pursuant to section 303, or in which a record or paper so demanded is

22  located, shall have jurisdiction…" 52 U.S.C. § 20705. Nevertheless, the Court rendered its decision

23

24  ─────────────────────

25  [4] The *Oregon* decision similarly misreads *Lynd* by reasoning "the Court doubts its applicability
    here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary

26  litigation" instead of applying "directly to the court for the records." *Oregon*, slip op. at 15 n.1.
    *Lynd* does not say filing a pleading waives the expedited process under the CRA. Instead, as

27  discussed above, the Fifth Circuit explained only that any pleadings that are filed do not need to

28  "satisfy usual notions under the Federal Rules of Civil Procedure." 306 F.2d at 225-26.

8

1    on the merits, resting on an alleged waiver of subject matter jurisdiction and a "critical" need for

2    the merits to be examined. *Id.* at 12.

3         The United States considers the language in Section 305 to apply to venue as opposed to

4    jurisdiction, and thus the District Court's analysis was incorrect *ab initio*. The provision in 52

5    U.S.C. § 20705 is focused on "where" a case may be brought, not "whether" it may be brought,

6    *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006)—the tell-tale sign of a special venue

7    provision. 14D Richard D. Freer, *Federal Practice & Procedure* § 3801 (4th ed.) ("[S]ubject matter

8    jurisdiction addresses whether a dispute may be heard by a federal court at all.  If so, venue then

9    determines *which* federal court—usually meaning which federal district—should hear the case."

10   (footnote omitted)). In similar situations, the Supreme Court has interpreted a provision of the Jones

11   Act prescribing where suit may occur and using the word "jurisdiction" as "refer[ring] only to

12   venue." *Pure Oil Co. v. Suarez*, 384 U.S. 202, 203 (1966) (citing *Panama R. Co. v. Johnson*, 264

13   U.S. 375, 384 (1924)); *see Pure Oil*, 384 U.S. at 203 ("Jurisdiction in such actions shall be under

14   the court of the district in which the defendant employer resides or in which his principal office is

15   located.").  In *In re Duncan,* the Ninth Circuit addressed a statute providing that "[t]he jurisdiction

16   of the courts herein specified to naturalize persons shall extend only to such persons resident within

17   the respective jurisdiction of such courts." 713 F.2d 538, 542 (9th Cir. 1983)  The court held that

18   this sentence was a "special venue provision" that did not affect "subject matter jurisdiction" and

19   was thus waivable. *Id.*

20        Nevertheless, the District Court treated this as a jurisdictional requirement, and thus every

21   element of the decision that followed was in error.  It is axiomatic that "subject-matter jurisdiction,

22   because it involves a court's power to hear a case, can never be forfeited or waived." *United States

23   v. Cotton*, 535 U.S. 625, 630 (2002). "[C]ourts … have an independent obligation to determine

24   whether subject-matter jurisdiction exists, even in the absence of a challenge from any party."

25   *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). When a court concludes it lacks subject-matter

26

27

28

9

1   jurisdiction, only a single action is available: "the court must dismiss the complaint in its entirety."[5]

2   *Id.* The *Weber* court therefore lacked any discretion to reach the merits of the claims and defenses

3   thereto, regardless of whether the court deemed the case "concern[ed] matters of national

4   importance." *Weber*, slip op. at 12. As the Ninth Circuit has explained, once the court finds it lacks

5   jurisdiction, the judge "retain[s] no power to make judgments relating to the merits of the case."

6   *Cook v. Peter Kiewit Sons Co.*, 775 F.2d 1030, 1035 (9th Cir.1985); *see also Franklin v. Or.*

7   *Welfare Div.*, 662 F.2d 1337, 1343 (9th Cir. 1981) ("[D]ismissal for failure to state a claim requires

8   a judgment on the merits and cannot be decided before the court has assumed jurisdiction."). *Weber,*

9   *by its own terms, even though incorrectly applied,* lacked subject matter jurisdiction to analyze the

10  merits. Consequently, its entire discussion of the CRA outside of Section 305 is dictum entitled to

11  no weight in this, or any other, case. *See Exp. Grp. v. Reef Indus., Inc.*, 54 F.3d 1466, 1472 (9th

12  Cir. 1995) (holding that dicta, including statements "not necessary to the decision," "have no

13  binding or precedential impact…").

14      Notably, a recent decision issued by a District Court in the Sixth Circuit rejected the

15  arguments raised by Secretary Aguilar in his Motion to Dismiss and by Defendant-Intervenors in

16  their opposition to the Motion to Compel. *See United States v. Benson*, Case No. 1:25-cv-01148-

17  HYJ-PJG, slip op at 14. (W.D. Mich. Feb. 10, 2026) (attached to 2d Neff Decl. as Ex. 12). Instead,

18  the *Benson* court construed "a request for records under the CRA as a form of administrative

19  subpoena." *See* Slip. op. at 14 (citing *Lynd*, 306 F.2d at 225 and *In re Gordon*, 218 F. Supp. 826,

20  826-27 (S.D. Miss. 1963)). Therefore, "[m]ost of the Federal Rules of Civil Procedure are simply

21  inapplicable…" *Benson*, slip op. at 15. The court acknowledged that "'a district court's role in the

22  enforcement of an administrative subpoena is a limited one.'" *Id.* (citation omitted).

23

24

25

        ─────────────────────

26  [5] "In general, dismissal for lack of subject matter jurisdiction is without prejudice." *Missouri ex*
27  *rel. Koster v. Harris*, 847, F.3d 646,656 (9th Cir. 2017); *see also United States v. Raffensperger*,
    Case No. 5:25-cv-548-CAR, slip op. (M.D. Ga. January 23, 2026) (court lacked jurisdiction to
28  compel CRA records in Middle District of Georgia) (attached to 2d Neff Decl. as Ex. 15).

**B.      Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.**

Title III of the Civil Rights Act of 1960 is entitled "Federal Election Records." CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960). This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…." 52 U.S.C. § 20701. Section 303 authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [her] representative." 52 U.S.C. § 20703.

Notwithstanding the CRA's plain language, Secretary Aguilar argues that the only permissible basis for a Title III request is to "… facilitate investigation into Civil Rights violations related to discrimination in voting." Def.'s Mot., Doc. 42 at 7. Defendant-Intervenors similarly contend that the CRA is limited to "racial discrimination," despite the absence of any language in Title III supporting their position. *See* Def.-Intervenors' Resp. in Opp'n, Doc. 37 at 6. Congress made clear in the CRA where it intended a remedy to be limited to racial discrimination. *See* Section 601 of the CRA, P.L. No. 86-449, 74 Stat. 90 (applying Title VI of the CRA to violations of rights "on account of race or color") (codified as amended at 52 U.S.C. § 10101). That is consistent with express limitations Congress made to remedies in other civil rights statutes. *See, e.g.*, 42 U.S.C. § 2000e-2 (prohibiting employment practices "because of such individual's race, color…" in Title VII of the CRA of 1964); 52 U.S.C. §§ 10301-10306, 10309 (prohibiting discrimination "on account of race, color," or language minority status in the Voting Rights Act of 1965); 42 U.S.C. §§ 3604-3606, 3617 (prohibiting discrimination in housing or rentals "because of "race, color, … or national origin" in the Fair Housing Act of 1968). No such language limiting Title III of the CRA to voting rights violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706.

11

Moreover, in *Gallion,* a case cited by Defendant-Intervenors, *see* Def.-Intervenors' Resp. in Opp'n, Doc. 37 at 6, the court concluded "that the prescribed standard of Section 301 is *clear and unambiguous*." *Gallion*, 187 F. Supp. at 848 (emphasis added). Specifically, Title III functions as "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute." *Coleman II*, 313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (a sufficient purpose to examine federal election records is "to see if any Federal laws were violated").

Secretary Aguilar suggests that enforcing list maintenance by examining compliance with HAVA's identification requirements is incompatible with securing an individual's right to vote. *See* Def.'s Mot., Doc. 42 at 7-9. He is mistaken. In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford (Rep.) and Jimmy Carter (Dem.) serving as Honorary Co-Chairs, explained why adding driver's license information and the last four of the Social Security numbers for federal elections protected individual voters:

> Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form. An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier. The Federal Election Commission has made the same recommendation.

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32-33 (Aug. 2021) (excerpts provided as 2d Neff Decl., Ex. 11). Furthermore, the Commission noted that it was "estimated that 92% of all registered voters also have a driver's license," *id.* at 30, which strongly supported use of a driver's license number as a unique identifier for each voter who possessed one. The Commission recognized that "accuracy" of a statewide voter registration

12

1  database "can mean access." *Id.* It explained, "[u]sed cumulatively, this information could improve

2  the accurate exchange of information affecting voter eligibility and help avoid mistaken voter

3  removals like those that occurred in Florida." *Id.* at 33. Congress heeded the Commission's finding

4  that inaccurate voter databases can disenfranchise individual voters when it enacted HAVA in 2002.

5  It explained how list maintenance and compliance with HAVA's identifying numbers helps protect

6  an individual's right to vote: to "reduce the incidence of voters appearing at a polling place only to

7  discover that no record of their registration can be found."[6] H.R. Rep. 107-329, pt. 1, at 36 (2001).

8        Engrafting a requirement of racial discrimination that does not exist in Title III of the CRA

9  would violate the statute's express congressional mandate, while also undermining the Attorney

10  General's enforcement of requirements in HAVA and the NVRA that help protect voting rights.

11  Where, like here, the language of an enactment is unambiguous, "…the words employed are to be

12  taken as the final expression of the meaning intended." *United States v. Pan-Am. Petroleum Co.,*

13  55 F.2d 753, 771 (9th Cir. 1932) (quoting *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278

14  (1929)). Well-established principles of statutory construction foreclose federal courts from

15  rewriting a statute in a manner that better suits a litigant. As the Supreme Court explained, "[t]he

16  judicial function to be exercised in construing a statute is limited to ascertaining the intention of

17  the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v.*

18  *Poston*, 266 U.S. 548, 554-55 (1925). "[W]here the language of an enactment is clear, and

19  construction according to its terms does not lead to absurd or impracticable consequences, the

20  words employed are to be taken as the final expression of the meaning intended. And in such cases

21  legislative history may not be used to support a construction that adds to or takes from the

---

[6] Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. 2d
Neff Decl. ¶¶ 12-14. In 2025, North Carolina election officials admitted that the state "maintained
and used a HAVA List that includes records that do not comply with the requirements for Federal
elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. &
Order at 4 (E.D.N.C. Sept. 8, 2025) (attached as 2d Neff Decl., Ex. 9). As a result of the Attorney
General's enforcement action, North Carolina has reduced the number of voter records missing an
identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*,
Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached as 2d Neff Decl., Ex.10).

significance of the words employed." *Mo. Pac.*, 278 U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what Congress might have written." *United States v. Great N. Ry. Co.*, 343 U.S. 562, 575 (1952). "After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process …." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

The *Benson* court rejected arguments that parallel those of the Defendants in this case, concluding that the CRA cannot be rewritten to restrict the statute's scope. The court first rejected *Weber*'s imposition of a temporal limitation on the CRA to only those statutes in effect when the Act became law. The court explained, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes." *Benson*, slip op. at 17. Turning to the argument that Title III of the CRA only could be used to investigate racial discrimination, *Benson* observed that "the CRA's text includes no such limitation…" *Id.* Investigating list maintenance efforts under the NVRA fit neatly within the scope of Title III: "The CRA aides the Attorney General in assessing states' compliance with federal election law and protecting voting rights; the NVRA is a federal election law that protects voting rights." *Id.*

As a result, the United States respectfully submits that the Court must decline Defendants' invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III. *See id*.

**C.     Defendants cannot challenge the Attorney General's basis and purpose to investigate Nevada's HAVA and NVRA compliance.**

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records. As explained in the preceding discussion, it covers "all records and papers" which come into possession of an officer of election that relate to any prerequisite to voting in a federal election, including voter registration applications and records. 52 U.S.C. § 20701. Pursuant to Section 303 of the Act, to obtain those

1  federal election records, the Attorney General need only make to an officer of election with

2  custody, possession, or control of those records a "demand in writing" for "inspection,

3  reproduction, and copying," accompanied by "a statement of the basis and the purpose therefor."

4  52 U.S.C. § 20703. After that written demand has been made, and the officer of election has rejected

5  it, the Attorney General may seek an order from the federal court "to compel the production of such

6  record or paper." 52 U.S.C. § 20705.

7       In the August 14 Letter, the Attorney General made a written demand under Section 303

8  of the CRA for Nevada's federal election records, including its SVRL. For the basis, the letter

9  specifically cited Section 303 of the CRA, stating that "[p]ursuant to the foregoing authorities,

10  including the CRA, the Attorney General is demanding an electronic copy of Nevada's complete

11  and current [SVRL]." Mot. to Compel, Doc. 2, Ex. 3 at 2. It further explained that the purpose "is

12  to ascertain Nevada's compliance with the list maintenance requirements of the NVRA and

13  HAVA." *Id.*

14       Nevertheless, Defendants argue that the United States failed to provide a sufficient

15  statement of the basis and purpose of its request for federal election records. Secretary Aguilar

16  criticizes the Attorney General's stated basis and purpose for making what it claims "amounts, at

17  best, only to a statement of its purpose." Def.'s Mot., Doc. 42 at 5. Secretary Aguilar further argues

18  that the August 14 Letter "fails to provide any statement of its grounds for suspecting that Nevada

19  was violating the NVRA or to explain how the requested records are relevant to its inquiry." *Id.*

20  Defendant-Intervenors make related arguments. *See* Def.-Intervenors' Resp. in Opp'n, Doc. 37 at

21  12.

22       Federal courts have rejected contentions that parallel those made by Defendants.

23  Defendants' contention that the demand needs to include a factual basis showing an *extant*

24  violation of federal law, fails for the reasons discussed above. *See supra* Part III(A) (describing

25  why the investigative nature of a demand under Title III forecloses any requirement that a specific

26

27

28

1    allegation of a violation of federal law be included in that demand). Instead, a reference to the

2    statutory basis for making the demand, namely the CRA, suffices.[7]

3        Similarly, Section 303's requirement that the written demand "contain a statement of the

4    basis and the purpose therefor," 52 U.S.C. § 20703, "means only that the Attorney General [must]

5    identify in a general way the reasons for [her] demand." *Coleman II*, 313 F.2d at 868 (citation

6    omitted). "Clearly a sufficient statement would be the assertion that the demand was made for the

7    purpose of investigating *possible violations* of a Federal statute." *Id.* (emphasis added); *see also*

8    *Coleman I*, 208 F. Supp. at 200 (the written demand need only indicate the records were needed

9    "to see if any federal laws were violated"); *cf. Morton Salt*, 338 U.S. at 642-43 (same construction

10   of administrative subpoena under the IRC). The United States satisfied that requirement by stating,

11   "[t]he purpose of the request is to ascertain Nevada's compliance with the list maintenance

12   requirements of the NVRA and HAVA." 8/14 Ltr., Ex. 3 to Doc. 3-1.

13       Contrary to what Defendants argue, they are prohibited from using "any procedural device

14   or maneuver," including Secretary Aguilar's motion to dismiss, to challenge or "ascertain the

15   factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the

16   purpose therefor' as set forth in the written demand." *Lynd*, 306 F.2d at 226. No discovery or other

17   tools ordinarily available under the Federal Rules of Civil Procedure may be used to question or

18   examine "the reasons why the Attorney General considers the records essential…" *Id.* "Questions

19   of relevancy or good cause or other like considerations" that may be assessed under other statutes

20

---

21   [7] Even if more of an explanation was required, to wit, why the records are needed, the Attorney
22   General did so in her August 14 Letter, in which she wrote:

23           When providing the electronic copy of the [SVRL], Nevada must ensure that
             it contains *all fields*, which includes the registrant's full name, date of birth,
24           residential address, his or her state driver's license number or the last four
             digits of the registrant's social security number [SSN4] as required under …
25           HAVA … to register individuals for federal elections.

26   8/14 Ltr., Ex. 3 to Doc. 3-1 (emphasis in original). An accompanying footnote explained that when
27   Congress charged the Attorney General with HAVA enforcement, it "plainly intended that [the]
     Justice Department be able to conduct an independent review of each state's list." *Id.* at n.2.

28

16

to which the Federal Rules of Civil Procedure are applicable "are completely foreign to the summary proceeding" under Section 304 of the CRA. *Id.* at 228; *see also Benson*, slip op. at 16-17 ("[T]he CRA does not allow courts to evaluate the substance of the DOJ's purported basis and purpose."). Congress vested the Attorney General with broad authority to obtain federal election records under Title III of the CRA. *Coleman I*, 208 F. Supp. at 200-01. In sum, "the factual foundation for, or the sufficiency of, the Attorney General's" written demand under Section 303 "is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226; *cf. Powell*, 379 U.S. at 56 (explaining that there is no judicial oversight "to oversee the [IRS] Commissioner's determinations to investigate"). Secretary Aguilar's motion to dismiss the CRA claim for not meeting an elevated showing of statement of "the basis and the purpose" fails under the plain language of the statute, as applied by federal courts.

> ### D. Nevada's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in federal elections.

The scope of federal election records covered by Title III of the CRA is broadly established by Congress. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added). This language is unequivocal in its breadth.

Indeed, federal courts that have applied Section 301 have concluded that Congress meant what it said in the statute. It does not exclude production of electronic or non-public records, as Defendants argue. *See* Def.'s Mot., Doc. 42 at 9; Def.-Intervenors' Resp. in Opp'n, Doc. 37 at 7. One court explained in detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for

1    a period of twenty-two months 'from the date of any general, special, or
2    primary election …' if they relate to acts requisite to voting in such election.

3    *Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701). In *Lynd*, the Fifth Circuit likewise

4    recognized that "the papers and records" covered by Section 301 "have been specifically identified

5    by Congress." 306 F.2d at 226. This requirement "is sweeping." *Id.* It applies to "all records and

6    papers," as the statute provides, *id.*, and cannot be circumvented in the manner that the Defendants

7    suggest.[8]

8    Finally, Defendants' construction would create absurd results. Title III was enacted to, *inter*

9    *alia*, counteract discriminatory practices in allowing citizens to vote. *Lynd*, 306 F.2d at 228. (This

10   is not to say that this is Title III's sole purpose. It is not.) The United States previously has pursued

11   successful matters, including in litigation, to obtain statewide voter registration lists under Title III

12   of the CRA. For example, in two of those matters against Georgia and Texas, the United States

13   obtained the SVRLs, including drivers' license numbers and SSN4s, to evaluate compliance with

14   the NVRA, including that Act's list maintenance requirements.[9] To ascertain whether a jurisdiction

15   engages in practices that violate federal law (whether HAVA, the NVRA, the Voting Rights Act

16   or any other one), the Attorney General needs to examine both applications to register to vote *and*

17   the final voting rolls, including the electronic SVRL, so as to assure herself that the applications

---

18   [8] The *Benson* court read Section 301 much more narrowly and denied production of a SVRL for a
19   reason not raised by Secretary Aguilar: that it applies "only to documents that people submit to the
20   State as part of the voter registration process, not a document like the voter registration list that is
21   created by state officials." Slip op. at 18-19. The United States respectfully disagrees; no other
     federal court has adopted such a limitation. Moreover, today many – and likely even most – voter
22   registration applications are only in electronic form in a SVRL. Such a reading would effectively
23   carve out vast numbers of federal election records, which was plainly not the intention of Congress
     in passing such "sweeping" legislation. *Lynd*, 306 F.2d at 226.

24   [9] *See* Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), Doc. 1. The
25   Court entered a consent decree in the Georgia case requiring production of the SVRL. *See Georgia*,
     *supra*, at Doc. 4 (filed Oct. 27, 2006). The Texas matter was resolved by a Memorandum of
26   Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and
     Texas (May 13, 2008), *available at* https://www.justice.gov/media/1173461/dl?inline (last visited
27   Feb. 11, 2026). For the Court's convenience, the three documents are provided herein as 2d Neff
28   Decl., Exs. 6-8.

are being properly processed and that reasonable list maintenance efforts have been practiced. *See* 2d Neff Decl. ¶¶ 3-4, 7-11. Limiting the Attorney General's ability to anything other than *all records* would make it nearly impossible for her to carry out the duties assigned to her by Congress. Because Defendants' suggested statutory construction would lead to absurd results that no rational legislator could have possibly intended, the Court should reject it.

**E.      The United States is entitled to unredacted "reproduction" and "copying" of Nevada's federal election records, including its SVRL.**

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or her representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…." 52 U.S.C. § 20703. "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226. The question is only "open for determination" by the Court if "a genuine dispute… arises as to whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers … relating to any … act requisite to voting'…." *Id.*

Nevertheless, Defendants ask the Court to legislate limitations conspicuously absent from Title III. First, Secretary Aguilar argues that no records need to be produced to the United States. Instead, he contends, "A valid demand would require only that the records 'be made available … at the principal office of such custodian.'" Def.'s Mot., Doc. 42 at 11 (citing 52 U.S.C. § 20703). However, the statutory language Secretary Aguilar omits with ellipses is telling. The complete relevant text of Section 303 provides, "[a]ny record or paper required by [Section 301] to be retained and preserved shall, upon demand in writing by the Attorney General … be made available for inspection, *reproduction, and copying* at the principal office of such custodian by the Attorney General or [her] representative." 52 U.S.C. § 20703 (emphasis adding the language omitted by Secretary Aguilar in his brief). Federal courts have concluded that Section 303 requires reproduction and copying. For example, in *Lynd*, the court rejected a "mechanical objection[]" in which copying federal election records "would, at one time, have been a formidable thing." *Lynd*, 306 F.2d at 231. There, the court observed that "[m]odern photostating equipment will make short

19

1    order of most of these demands….” *Id.* Nevada's SVRL is required by HAVA to be in electronic

2    form. It is axiomatic that providing the United States with an electronic copy of its SVRL will be

3    much less burdensome than physical copying of every individual registration record if complete

4    physical records even exist outside of their electronic form.[10] Def.'s Mot., 42 at 9-11.

5            Secretary Aguilar cites state and federal statutes governing privacy of voter registration

6    records to support his argument that only a publicly available version of Nevada's SVRL is

7    required. *See id.* The statutory text of Title III itself makes clear that the records that must be

8    produced under the CRA are not limited to only those that are public. Section 304 of the CRA

9    explicitly requires the nondisclosure of records produced to the Attorney General under the Act:

10               Unless otherwise ordered by a court of the United States, neither the
                 Attorney General nor any employee of the Department of Justice, nor any
11               other representative of the Attorney General, shall disclose any record or
                 paper produced pursuant to this chapter, or any reproduction or copy, except
12               to Congress and any committee thereof, governmental agencies, and in the
                 presentation of any case or proceeding before any court or grand jury.
13

14    52 U.S.C. § 20704. Section 304's privacy protection only has meaning if the records covered by

15    the CRA include non-public information. Yet, Defendants ignore the plain language of Section 304

16    and ask the Court to do the same by rewriting the CRA to exclude all non-public records and

17    information. Congress rejected the position that they advance by its broad reference to "all records

18    and papers…" 52 U.S.C. § 20701. In sharp contrast, where Congress intended to require a smaller

19    class of records to be produced in a statute, it has said so. *See* 52 U.S.C. § 20507(i) (providing in

20    the NVRA that voter records to be produced to the public for assessment of list maintenance "shall

21    include lists of the names and addresses" of voters sent confirmation notices and any responses).

22    To put it succinctly: Section 301 means what it says in requiring production of "all records and

23

24    ─────────────────────

25    [10] According to the data that Nevada reported to the U.S. Election Assistance Commission, it is
       doubtful that hundreds of thousands of federal voter registration records exist in any medium other
26    than electronic form. A large percentage of voter registration transactions were reported as being
       through e-mail, online, and in-person, and through computer entries at designated voter registration
27    locations. *See* U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2024
       Comprehensive Report at 158, 162 (June 2025), *available at* https://www.eac.gov/research-and-
28    data/studies-and-reports (last visited Feb. 11, 2026).

1  papers" relating to registration to vote in a federal election, including Nevada's SVRL. 52 U.S.C.

2  § 20701. As *Lynd* made clear, "All means all." 306 F.2d at 230. Therefore, the argument by

3  Defendants that all electronic and non-public records are excluded fails as a matter of law.

4        The United States will strictly abide by the statutory limitations in Section 304 and other

5  federal privacy laws. The unredacted SVRL and other responsive federal election records can

6  certainly be produced to the United States consistent with these federal protections through a

7  protective order.[11] *Lynd*, 306 F.2d at 230.

8        Finally, if the Defendants' position were to be adopted, it would eviscerate Title III. The

9  Attorney General can only meaningfully investigate and enforce list maintenance requirements

10  under HAVA and the NVRA by having access to the voter identification numbers required by

11  federal law. For each voter, that includes their driver's license number, their SSN4, or other HAVA

12  identifying number. *See* 52 U.S.C. § 21083(a)(5)(A). As explained above, that information is

13  necessary to identify duplicate registration records, registrants who have moved, and registrants

14  who have died, or who are otherwise no longer eligible to vote in federal elections.[12] *See supra*

15  Part III(B). There is no question that enforcement of the list maintenance requirements of HAVA

16  and the NVRA are for "the purpose of investigating possible violations of a Federal statute." *See*

17

18  _____

19  [11] Consistent with this approach to address any reasonable privacy concerns without impeding the

20  Attorney General's authority to enforce federal law, the United States has offered all states a

21  memorandum of understanding, or MOU, memorializing these requirements. *See* Neff Decl. ¶ 18,
   Doc. 3-2; 2d Neff Decl. ¶¶ 15-16. As of February 11, 2026, twelve states have provided their
   SVRLs without any MOU. Second Neff Decl. ¶ 16. Two states have agreed to provide their SVRL

22  under the terms of the MOU. *Id*. Six other states have indicated their intention to provide the SVRLs

23  in the near future. *Id*.

24  [12] *See generally* 52 U.S.C. § 20507(a)(4) ("In the administration of voter registration for elections
   for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort

25  to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A)
   the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. §

26  21083(a)(4) ("The State election system shall include provisions to ensure that voter registration
   records in the State are accurate and are updated regularly, including… (A) A system of file

27  maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from
   the official list of eligible voters….").

28

1    *Coleman II*, 313 F.2d at 868; *cf. Morton Salt*, 338 U.S. at 642-43 (confirming compliance with

2    federal law is a legitimate purpose).

3         The data the United States has requested under the CRA is the same that twenty-five states

4    (including Nevada) and the District of Columbia routinely share through the Electronic

5    Registration Information Center, ("ERIC"), to facilitate their compliance with federal list-

6    maintenance requirements.[13] Similarly, private parties have been granted access to even more

7    detailed voter data than what the United States has requested where necessary to bring actions to

8    enforce federal rights. *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL

9    1503937, at *2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New

10    Hampshire statewide voter database and all documents concerning the use of the statewide voter

11    database, including instruction manuals or other guides concerning the data fields contained in the

12    database and their correct interpretation."), *appeal dismissed*, No. 25-1585 (1st Cir. July 2, 2025).

13         Accordingly, the United States is entitled to reproduction and copying of Nevada's

14    unredacted electronic SVRL under the unambiguous language of Section 303 of the CRA. *See* 52

15    U.S.C. § 20703; *see also Gallion*, 187 F. Supp. at 855-56 (granting the Attorney General "an order

16    to require the production of records for inspection, reproduction and copying…"); *Lynd*, 306 F.2d

17    at 226 (same).

18        **IV.    THE UNITED STATES IS COMPLYING WITH FEDERAL PRIVACY LAWS**

19         Secretary Aguilar makes a variety of arguments that privacy laws require dismissal of the

20    United States' efforts to compel production of Nevada's federal election records. *See* Def.'s Mot.,

21    Doc. 42 at 11-15. Those arguments are misguided at best. The United States does not dispute that

22    the requirements of the Privacy Act and Section 304 of the CRA apply here, and it is complying

23    with those requirements. The First Amendment does not prohibit the collection of voter information

24    by the United States to assess compliance with HAVA and the NVRA. The requirement for a

25    Privacy Impact Assessment under E-Government Act does not apply to the investigation of

26    Nevada's list maintenance practices being conducted by the United States under HAVA and the

27

28    [13] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited Feb. 11, 2026).

1    NVRA. Likewise, the Driver's Privacy Protection Act does not limit the United States' ability to

2    conduct list maintenance activities. Each of these arguments will be addressed briefly in turn.

3            **A.    The United States is complying with the Privacy Act.**

4            Secretary Aguilar argues that the United States must comply with the Privacy Act, and the

5    United States is doing that. But Secretary Aguilar goes even further, contending that the Complaint

6    must be dismissed because the United States "fails to include allegations" about how the demand

7    for records complies with the Privacy Act. Def.'s Mot., Doc. 42 at 13. Not surprisingly, however,

8    there is no requirement in federal law requiring that the United States plead its compliance with the

9    Privacy Act in every complaint it brings in which it may obtain records that contain personally

10   identifiable information. Rather, the Privacy Act and Section 304 of the CRA simply require that

11   when protected information is obtained, it must be securely stored and not be subject to

12   unauthorized dissemination or use.

13           The voter information that the United States is collecting is maintained according to the

14   Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy

15   Policy, which it has published online. The full list of routine uses for this collection of information,

16   which include investigations and enforcement actions, can be found in the Department of Justice's

17   systems of records notices ("SORN"), most of which are identified with their citations in U.S. Dep't

18   of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in

19   a table at pages 24,148 to 24,151.

20           The statutes cited for routine use include the NVRA, HAVA, and the Civil Rights Act of

21   1960, as described in note 16 of the Department of Justice's Privacy Policy. The United States made

22   its requests pursuant to those statutes. *See* Exs. 1, 3 to Doc. 3-1. The records in the system of records

23   are kept under authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the

24   responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

25           Also, contrary to what Defendants contend through third-party hearsay, the records the

26   United States is seeking to compel under the CRA are not intended "to create a nationwide voter

27   list, an unprecedented scheme not authorized by any source of law." Def.-Intervenors' Resp. in

28   Opp'n, Doc. 37 at 11; *see also* Def.'s Mot., Doc. 42 at 9 (arguing the federal government [is] laying

the groundwork to amass the personal information of millions of Americans in a centralized database."). Rather, the records sought from Nevada are necessary to perform an individualized assessment of the State's efforts to comply with HAVA and the NVRA.[14] 2d Neff Decl. ¶ 5. The extent of the litigation necessary to obtain those records, in this case and in others, reflects a coordinated effort to impede federal enforcement of those statutes in every state.

Similarly, to the extent that Defendants are concerned about the transport of such data to the United States, the Department of Justice uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs.

Moreover, the Privacy Act does not bar the disclosure of Nevada's SVRL to the United States, as Secretary Aguilar contends. Def.'s Mot., Doc. 42 at 11. The Privacy Act regulates federal agencies' collection, maintenance, and disclosure of information within their own systems of records—it does not restrict the ability of state actors to share information with federal agencies. The statute's plain language confirms that it applies only to federal "agencies" as defined in 5 U.S.C. § 552a(a)(1), meaning "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government." State and local entities fall outside that definition. The Privacy Act "erects certain safeguards for an individual against an invasion of personal privacy," Pub. L. No. 93–579, § 2(b), 88 Stat. 1896 (1974), only within the scope of federal agency record systems. There is no basis for Secretary Aguilar to fail or refuse to disclose information to a federal agency for law enforcement purposes, particularly here, where the United States is complying with the provisions of the Privacy Act.

---

[14] When the Civil Rights Division performs this individualized assessment, the State's SVRL is compartmentalized and maintained by the Civil Rights Division separately from the SVRL of any other State. The maintenance, use, and destruction of those records is in full compliance with the requirements in the CRA, Privacy Act, and all other federal laws governing the records. 2d Neff Decl. ¶ 6.

**B.    The First Amendment does not prohibit access to data the United States needs for its HAVA and NVRA claims.**

The United States is not violating 5 U.S.C. § 552a(e)(7) of the Privacy Act by requesting Nevada's SVRL. Secretary Aguilar contends that voter registration data the United States seeks is a form of "political expression protected by the First Amendment" and implicates a statutory bar to collecting such data. Def.'s Mot., Doc. 42 at 12. But Secretary Aguilar misses the mark. The decisions he cites merely stand for the propositions noted; namely, that voting and registration implicate speech and actions protected under the First Amendment. *See id.* They do not foreclose the United States from enforcing federal election laws like HAVA and the NVRA. Indeed, application of Secretary Aguilar's argument would effectively prevent the Voting Section of the Civil Rights Division from engaging in any investigations or enforcement actions at all. That plainly is not what Congress intended.

**C.    The E-Government Act does not prevent the United States from obtaining data supporting its HAVA and NVRA claims.**

Secretary Aguilar next argues that the demand for production of Nevada's SVRL and other federal election records violates the E-Government Act. According to Secretary Aguilar, the Voting Section is required to conduct a "privacy impact assessment," or "PIA," before initiating investigations of each state's compliance with HAVA and the NVRA. *See* Def.'s Mot., Doc. 42 at 14. Again, neither the E-Government Act nor interpretative case law support his assertion.

The E-Government Act neither authorizes dismissal of this case nor limits the United States' ability to bring suit. The E-Government Act is not applicable to the United States' enforcement of HAVA and the NVRA. The United States is not initiating a new process whereby it is contacting individuals for information as contemplated by Pub. L. No. 107–347, § 208(b)(1)(A)(ii)(II), which "includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." The request is made to Secretary Aguilar to provide a voter registration list already maintained pursuant to federal law to analyze Nevada's federally required list maintenance. The

1  SVRL would be kept on a system for which a Privacy Impact Assessment has been done.[15] Only

2  when a new system is established—not when each new data request is made—is a Privacy Impact

3  Assessment required.[16]

4  Applying the E-Government Act to enforcement of voting statutes would lead to an absurd

5  result in which thousands of Privacy Impact Assessments would have to be done whenever the

6  Voting Section gathers any voter data to enforce the Voting Rights Act, NVRA, HAVA, or the

7  Uniform and Overseas Citizens Voting Act. Nothing in the E-Government Act or the purpose of the

8  privacy provision in the Act suggests it was meant to encompass the enforcement provisions of all

9  voting laws where voter data is examined. *See* Pub. L. No. 107–347, § 208(a).

10  Even if the Court found the E-Government Act applied here—and it should not—Secretary

11  Aguilar has misplaced his reliance on *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on*

12  *Elec. Integrity*, 266 F. Supp. 3d 297 (D.D.C. 2017) ("*EPIC I*"). *See* Def.'s Mot., Doc. 42 at 14.

13  *EPIC I* does not support dismissal of a complaint based on an alleged failure to conduct a PIA. In

14  that case, the plaintiff sought to enjoin a federal commission's collection of state voter information,

15  claiming the commission had failed to prepare a PIA under § 208 of the E-Government Act. The

16  D.C. Circuit affirmed dismissal of the claim on standing grounds. *See Elec. Priv. Info. Ctr. v.*

17  *Presidential Advisory Comm'n on Elec. Integrity*, 878 F.3d 371 (D.C. Cir. 2017) ("*EPIC II*"). In

18  doing so, the *EPIC II* court explained that the Act "is intended to protect *individuals*—in the present

19  context, voters—by requiring an agency to fully consider their privacy before collecting their

---

22  [15] An Initial Privacy Assessment (IPA) Determination was issued on October 12, 2012, showing
23  that no Privacy Impact Assessment is required for the Justice Consolidated Office Network (JCON)
   system where personal identifying information associated with the United States' CRA demand is
24  stored. *See* 2d Neff Decl. ¶ 17.

25  [16] When the Civil Rights Division began using ServiceNow (SNOW), a FedRAMP High-compliant
   Software as a Service (SaaS) cloud-hosting provider offering a suite of natively integrated
26  applications designed to support Information Technology Service Management (ITSM), resource
   management, and shared support services, it prepared a Privacy Act Assessment ("PIA") as
27  required by the E-Government Act. *See* Office of Privacy & Civ. Liberties, DOJ Privacy Impact
   Assessments, *available at* https://www.justice.gov/opcl/doj-privacy-impact-assessments (last
28  visited Feb. 11, 2026).

1 personal information. EPIC is not a voter and is therefore not the type of plaintiff the Congress had

2 in mind." *Id.* at 378 (emphasis in original).

3  **D.    The Driver's Privacy Protection Act does not allow Secretary Aguilar to deny**
   **the United States list maintenance data.**

4

5      Secretary Aguilar's contention that dismissal is warranted because he alleges that the United

6 States' "demand also violates Driver's Privacy Protection Act ('DPPA')" which "prohibits

7 disclosing 'personal information' that is obtained by the DMV…" likewise fails. Def.'s Mot., Doc.

8 42 at 14-15. The DPPA generally prohibits the disclosure of "personal information" obtained by a

9 state Department of Motor Vehicles in connection with a motor vehicle record. *See* 18 U.S.C.

10 §§ 2721(a), 2725(1), (3), (4). Nonetheless, the statute explicitly contains exceptions that permit

11 certain governmental uses. Under 18 U.S.C. § 2721(b)(1), disclosure is allowed "for use by any

12 government agency … in carrying out its functions," including law enforcement or other regulatory

13 enforcement purposes. This statutory language demonstrates that the DPPA was not intended to

14 block all government access to DMV records.

15      Secretary Aguilar cites *Reno v. Condon*, 528 U.S. 141 (2000), in his motion. Def.'s Mot.

16 Doc. 42 at 14. But in *Reno*, the Supreme Court confirmed that the DPAA is inapplicable to requests

17 like the one made by the United States. In that case, the Court upheld the DPPA against a Tenth

18 Amendment challenge, emphasizing that the statute regulates the use of DMV information rather

19 than the state itself. The Court explicitly recognized that the DPPA does not restrict a state agency's

20 use of personal information for its own functions, including enforcement and other official

21 governmental activities. Rather, "[t]he DPPA *permits* DMVs to disclose personal information from

22 motor vehicle records for a number of purposes." *Reno*. at 145 (emphasis added).

23      The DPPA's prohibition is clearly not implicated in the present case. The Department of

24 Justice is a government agency performing a statutorily mandated function—verifying voter

25 registration records and associated list maintenance activities by state and local entities. Under the

26 governmental-function exemption in § 2721(b)(1), the United States' use of DMV-provided

27 information is permissible, even though the information originates from a motor vehicle record.

28 Transfers of DMV data to government agencies for official functions, including voter registration

administration, are therefore consistent with the DPPA and fall squarely within the statute's exceptions.

## V. CONCLUSION

For the foregoing reasons, the United States respectfully submits that its Motion to Compel Production of federal election records under Section 305 of the CRA (Doc. 2) be granted, and Secretary Aguilar's Motion to Dismiss (Doc. 42) be denied.

Dated: February 12, 2026

Respectfully submitted,

SIGAL CHATTAH
First Assistant United States Attorney
District of Nevada
Nevada Bar No. 8264
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
Sigal.Chattah@usdoj.gov

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section

/s/ *Brittany E. Bennett*
BRITTANY E. BENNETT
JAMES T. TUCKER (Nevada Bar No. 12507)
Trial Attorneys, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street, Room 8.141
Washington, D.C. 20002
brittany.bennett@usdoj.gov
james.t.tucker@usdoj.gov
Tel. (202) 704-5430
Attorneys for the United States

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 12, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ *Brittany E. Bennett*
Brittany E. Bennett
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: brittany.bennett@usdoj.gov
